## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| ROBERT WEINTRAUB, as Natural Parent and Surviving Heir of WILLIAM WEINTRUAB, deceased, and as Administrator of the ESTATE OF WILLIAM WEINTRAUB, | ) ) ) ) | Civil Action<br><br>File No. _____ |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| ADVANCED CORRECTIONAL HEALTHCARE, INC. a foreign corporation, and PRISONER TRANSPORT SERVICES of AMERICA, LLC a foreign limited liability corporation | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT FOR DAMAGES
## <u>AND DEMAND FOR A JURY TRIAL</u>

Plaintiff, Robert Weintraub, in his capacity as the natural parent and surviving heir of William Weintraub, Deceased, and as Administrator of the Estate of William Weintraub, comes before this Honorable Court and sues the Defendants Advanced Correctional Healthcare, Inc. ("ACH"), and Prisoner Transport Services of America, LLC ("PTS") and alleges as follows:

1.

This is a diversity-based wrongful death action, survivorship action, and negligence action brought by Plaintiff Robert Weintraub pursuant to O.C.G.A. §§ 51-4-1 to 51-4-5 and other applicable Georgia law arising from the untimely and wrongful death of his son, William Weintraub, Ph.D. ("Dr. Weintraub"), who died on April 25, 2014, in Union County, Georgia.  Plaintiff brings this claim for damages against ACH and PTS seeking recovery from both defendants under the substantive laws of the State of Georgia, where Dr. Weintraub's death occurred.

**PARTIES, JURISDICTION, VENUE & SERVICE OF PROCESS**

2.

Dr. Weintraub was born on October 7, 1966 and died on April 25, 2014 as a result of acute peritonitis due to a perforated duodenal ulcer.  Dr. Weintraub was forty-seven (47) years old when he died.  At the time of his death, Dr. Weintraub was not married and had no natural children.  Pursuant to O.C.G.A. §§ 19-7-1(c)(1)-(2) and 51-4-4, Plaintiff Robert Weintraub (hereinafter "Plaintiff"), as natural parent and surviving heir, is entitled to assert claims for the full value of the life of William Weintraub, tangible and intangible, economic and non-economic, and shall hold the consideration for any release of the alleged wrongdoers for the benefit of the heirs at law of the decedent subject to O.C.G.A. § 51-4-2(d).

2

3.

Plaintiff Robert Weintraub is and has been at all material times relevant to this Complaint a resident and citizen of the State of Florida, currently residing in Amelia Island, Florida.  By filing this action in this Court, Plaintiff avails himself of the jurisdiction and venue of this Court, this District, and this Division.

4.

Plaintiff was duly appointed as the Administrator of the Estate of William Weintraub by order of the District Court of Boulder County, Colorado on April 1, 2015.  Pursuant to O.C.G.A. § 51-4-5(b), Plaintiff is the proper party to assert the claims of the Estate for: (1) funeral, medical, and other necessary expenses resulting from the death of Dr. Weintraub; (2) damages for his conscious pain and suffering prior to his death proximately resulting from the tortious acts and/or omissions alleged herein; and (3) punitive damages.

5.

Defendant ACH is an Illinois corporation with its principal place of business in Peoria, Illinois.  At all times pertinent to this Complaint, ACH was and is a private healthcare company in the business of providing contract healthcare services at detention and correctional facilities nationwide.  ACH is duly authorized by the Georgia Secretary of State to transact business in this State, and

it regularly transacts business in this State.  ACH may and will be served with valid process of the Summons and this Complaint through its registered agent for service of process listed with the Georgia Secretary of State, Corporation Process Company, at 328 Alexander Street, Suite 10, Marietta, Cobb County, Georgia 30060.  This Court has personal jurisdiction over ACH because of its continuous and systematic business contact with this State.  Venue is proper over ACH in this District and this Division pursuant to LR 3.1(B)(1)(a), NDGa. because Defendant ACH's registered agent in this State is located in Cobb County, which is within this District and Division.

6.

Defendant PTS is a Tennessee corporation with its principal place of business in Nashville, Tennessee.  At all times pertinent to this Complaint, PTS was and is a private for-profit company in the business of providing contract transportation services to public defenders, child support enforcement agencies, juvenile justice agencies, sheriffs, and corrections agencies  nationwide, including within, to, and from the State of Georgia.  At the time of his death, Dr. Weintraub was in the custody of PTS who was transporting detainees within, and to, the State of Georgia and, in particular, Union County, Georgia.  PTS regularly transacts business in this State.  Defendant PTS is subject to personal jurisdiction in this

4

Court pursuant to the provisions of Georgia's Long-Arm Statute, O.C.G.A. § 9-10-91(1)-(3), and because PTS has established sufficient minimum contacts within the State of Georgia such that maintenance of the suit does not violate due process protections. Venue is proper over PTS in this District and this Division pursuant to LR 3.1(B)(1)(a)-(b), NDGa. PTS may and will be served with valid process of the Summons and this Complaint at its principal office located at 1854 Air Lane Drive, Suite 20, Nashville, Davidson County, Tennessee, 37210.

7.

This matter in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity between the parties. Accordingly, this Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1332.

## OPERATIVE FACTS

8.

Plaintiff incorporates as if re-alleged paragraphs 1 through 7 above.

9.

Dr. William Weintraub was a very bright man who valued education. Not only did he have a Bachelor's of Science degree in Physics, a Master's of Science degree in Physics, and a Ph.D. in Nuclear Physics, he also worked in academia at

various universities throughout the country, including Coastal Carolina University and Ball State University.

10.

In 2013, Dr. Weintraub left Ball State University and moved to Boulder, Colorado to start his own business, Innovative Exploration Technologies, Inc. While starting up his business Dr. Weintraub worked part time for IBM.

11.

Pursuant to a tenant-tenant disagreement on January 1, 2014, Boulder Police arrived at Dr. Weintraub's apartment.  During the preliminary police investigation, Boulder Police performed a routine clearance on Dr. Weintraub and his co-tenant. This routine clearance showed that Dr. Weintraub was wanted on an outstanding warrant in Horry County, South Carolina for threatening a newspaper that refused to take down or retract a false story about Dr. Weintraub.  Pursuant to this warrant, Boulder Police took Dr. Weintraub into custody and detained him at the Boulder County Jail in Colorado.

12.

On March 14, 2014, John Hickenlooper, Governor of Colorado, executed an Extradition Demand and Agent Authorization, authorizing Dr. Weintraub's extradition from the Boulder County Jail to Horry County, South Carolina.

6

13.

PTS, a private for-hire contractor, was hired to safely and securely transport Dr. Weintraub from Colorado to South Carolina to address the pending charges. Indeed, PTS represents to the public on its website that it stresses safety and maintains an excellent safety record, and further states, "we have efficiencies in routes that we are able to pass on to you … we can move your prisoner at less cost than if you did it yourself."  PTS further claims, "Our Agents ... understand the importance of safety, timeliness, and efficiency."

14.

Before PTS took custody of Dr. Weintraub on April 14, 2014, William was experiencing stomach pains.  Over the previous months while awaiting PTS pick-up, the Boulder County Jail ("BCJ") had treated Dr. Weintraub's stomach pains with a regimen of Maalox, milk of magnesia, and Miralax.

15.

On April 14, 2014, PTS took over the custody, control, and care of Dr. Weintraub, and removed him from the custody of the BCJ.

16.

Once PTS took custody of Dr. Weintraub, all of the medications for Dr. Weintraub's stomach condition were cut off.  Starting on April 14, 2014, PTS

shackled Dr. Weintraub hand and foot and took him on a five-day cross-country trip from Colorado, to Utah, back across the mountains, and over the plains and hills to a holding facility in Kentucky.  At the mercy of PTS, Dr. Weintraub could not even get a Tums on his own.  Deprived of medications by PTS and with no ability to seek other medical care because he was in PTS's custody and control, Dr. Weintraub's stomach pains increased and a duodenal ulcer developed and/or worsened.

17.

On April 18, 2014 PTS admitted Dr. Weintraub to the Daviess County Detention Center in Owensboro, Kentucky ("detention center"), which PTS used as a hub for its detainees, en-route to South Carolina.  PTS had a contract with the detention center to house PTS detainees for a fee.

18.

Over the next seven days, from April 18 to April 24, 2014, Dr. Weintraub was held by PTS at the detention center, while PTS waited to have enough detainees to "efficiently" take a load to Georgia and South Carolina.

19.

During this time, and in fact throughout the entirety of 2014, ACH provided contract healthcare services at the detention center, including providing medical care and treatment to PTS detainees at the detention center.

20.

ACH was required by law to perform an initial medical screening on all prisoners upon admission to the jail and before their placement in prisoner living areas. Under the law, ACH owed duties of reasonable care – be they ordinary or professional in nature, or both – as the custodial healthcare provider to Dr. Weintraub.

21.

In violation of the law and its general common law duties as a provider of healthcare services, ACH failed to perform the legally mandated initial medical screening on Dr. Weintraub.

22.

At the detention center, Dr. Weintraub experienced ongoing and increasingly severe stomach pain issues. Over the seven days from April 18-24, 2014, ACH systemically ignored obvious evidence and signs of serious illness, the pleas of a critically ill man, and even the pleas of his fellow detainees.

23.

On April 21, 2014, Dr. Weintraub requested medical care by formally filing a Sick Call Request Form, in which Dr. Weintraub told ACH in writing that he was having, "lots of pain in stomach, was on Maalox 3x a day before picked up [on April 14, 2014]", and told ACH in writing that he was now experiencing "very intense pain" in his stomach.

24.

ACH ignored even this formal request for medical care for three (3) days. At the mercy of ACH, Dr. Weintraub could do nothing to help himself.  Deprived of medications since his last dose of Maalox at the Boulder County Jail on April 14, 2014, Dr. Weintraub's stomach pain intensified as his ulcer grew and went untreated by PTS and/or ACH.  The pain became so intense that Dr. Weintraub even passed out on the floor of the jail bathroom shower.

25.

Inmates heard Dr. Weintraub complaining and moaning in pain throughout the night while he was in the cell block, and they were even awoken in the middle of the night by Dr. Weintraub's cries.

26.

The GBI Homicide Investigation which occurred after Dr. Weintraub was found deceased, revealed abundant evidence of Dr. Weintraub's severe stomach pain and serious illness, including but not limited to the physical evidence of Dr. Weintraub profusely sweating in a "freezing cold cell block," passing out on a jail bathroom floor, and the pleas for help from fellow inmates that PTS and/or ACH ignored.   Dr. Weintraub's cries became so persistent and loud, and his condition so obviously bad, that even other inmates in the detention center banged and kicked on their cell doors, pleading and yelling for officers and ACH medical staff to help Dr. Weintraub.

27.

Despite Dr. Weintraub's obviously sick condition, his pleas for help, the fact that other inmates yelled for staff to help Dr. Weintraub, and despite Dr. Weintraub passing out in the shower, PTS and ACH ignored Dr. Weintraub's deteriorating condition, demonstrating, clearly and convincingly, such an entire want of care so as to give rise to a presumption of conscious indifference to consequences.

28.

Finally on April 23, 2014, nearly three days after Dr. Weintraub's formal sick call request, ACH, by and through its agents and employees acting in the

course and scope of their employment or agency, saw Dr. Weintraub for the first time at 1640 hours (approximately 4:40 PM).

29.

During this visit, ACH noted that Dr. Weintraub was in severe pain, specifically in his abdomen, and recorded his weight as 234 pounds – approximately 46 pounds less than his weight when PTS took custody of Dr. Weintraub from the Boulder County Jail on April 14, 2015.

30.

The ACH medical form of April 23, 2014, specifically notes Dr. Weintraub's complaints as, "**Severe pain – in abdomen – reports 'passing out in bathroom this AM'**." The ACH nurse's own assessment of Dr. Weintraub on April 23, 2014, specifically states:

> I/M [inmate] c/o severe pain in abdomen – specifically RUQ [right upper quadrant]. … I/M fidgeting [and] flailing on exam table. Unable to lay still for assessment of BS [bowel sounds]. Reports, 'Can't stand the pain to lay like this' (supine).

The ACH nurse gave Dr. Weintraub one antacid tablet, and sent him back to his cell. The ACH nurse noted that the medical plan was to simply "notify MD." At approximately 2030 hours on April 23, 3014, Dr. Weintraub told ACH he was feeling nauseated.

12

31.

Dr. Weintraub's condition continued to decline and, on April 24, 2014 at approximately **1600** hours (and only 12 hours before Dr. Weintraub would die in the back of PTS's van), Dr. Weintraub again complained to ACH and anyone else who would listen of "intense abdominal pain," again reported nausea to ACH, and further informed the ACH nurse that he was, "**vomiting blood**."  The April 24, 2014 record, filled out by ACH, callously notes that "no one saw it" [Dr. Weintraub's report of vomiting earlier]; but the ACH note continues to state in the very next line that, "I/M did vomit after lunch, **witnessed by RN** … Appears in pain. **Will notify MD.**"

32.

At **1730** hours on April 24, 2014, the ACH nurse made the following entry into the records, "Spoke [with] MD.  I/M [inmate] to leave [with] PTS in ~ 30 min. Ø new Orders."  The ACH nurse spoke with the doctor and, because Dr. Weintraub was going to leave the detention facility with PTS in approximately 30 minutes, nothing was done for Dr. Weintraub.

33.

The original ACH record documenting the April 24, 2014 notes from 1600 hours and 1730 hours referenced above was seized by the Kentucky State Police

13

after Dr. Weintraub's death on April 25, 2014, and it is part of the original Georgia Bureau of Investigation ("GBI") Homicide Investigation File.   In the original record of April 24, 2014, **seized by police as part of the GBI Homicide Investigation after Dr. Weintraub's death on April 25, 2014**, the note from 1730 hours was the last entry on the record.

34.

Upon information and belief, ACH altered and/or self-servingly supplemented the original records after they found out Dr. Weintraub had died.   At some point *after* Dr. Weintraub died, and *after* police seized that April 24, 2014 record which documented the notes from 1600 hours and 1730 hours, ACH altered the records and made *two additional entries onto the note*.   This altered record was obtained via a public records request to the Daviess County Detention Facility months after the death.   In the altered records, ACH added two notes which purport to "record" that Dr. Weintraub had become miraculously symptom free with no signs or symptoms of any distress and with no complaints whatsoever on April 24, 2014 at 1840 hours and again at 1930 hours.

35.

The post-mortem-created "1840" entry states, "I/M to leave [with] PTS in approx 1 hour.   I'm currently in cell … no c/o N/V [nausea/vomiting], no s/s of

14

distress."  The post-mortem-created "1930" entry states, "Inmate aware of getting ready to leave on PTS bus … No s/s of distress noted @ this time."  The April 24, 2014, "1840" and "1930" entries were <u>not</u> part of the original record seized by the police after Dr. Weintraub's death on April 25, 2014.

36.

Following the death of Dr. Weintraub, ACH tampered with the evidence by adding new notes to Dr. Weintraub's jail medical records.  Contrary to ACH's post-mortem-created notes -- which falsely claim Dr. Weintraub "did not exhibit any signs or symptoms of distress" in the hours before he was taken by PTS for the fatal transport -- Dr. Weintraub was in fact obviously critically ill as evidenced by not only the fact he was dead 8½ hours later due to a perforated ulcer that had spilled lethal gastric fluid and bacteria into his gut, but also by GBI investigation and eyewitnesses interviews, referenced below.

37.

On April 24, 2014, at approximately 1845 hours, three PTS transport agents arrived at the detention center to pick up Dr. Weintraub (along with ten other inmates) for transport.  Dr. Weintraub was told to walk up the hallway to the transport area.  At that time, based eyewitness interviews by the GBI, Dr. Weintraub could barely walk, he had sweat "pouring" off him in a "freezing cold"

15

jail; he "looked yellow with some type of jaundice"; "you could easily tell" and it was "very obvious" something was physically wrong with him; he was "sweaty, white in color, groaning, and looking like the '**walking dead**'"; he was "complaining the whole time .. pale, sweating profusely, and had bulging eyes"; he "**looked like death** … he had no color in his face and he was complaining about his stomach hurting and **they were just laughing at him** and carrying on because he was moaning you know…oh me..oh me.. The guards were **making fun** of him … He was just continuously moaning and his stomach was hurting.   His **pants were falling down**.   It was like he was **disoriented**. I thought the man wasn't right.  …  I thought he was mentally off.  They **put him in shackles** and we all **started down the hall**…pants kept falling";   he was sweating like it was "in the middle of the desert."   All of these quotations are documented in the GBI Homicide report from eye-witness interviews after Dr. Weintraub's death.

38.

Dr. Weintraub was so sick, weak, and disoriented, he could not even step up into the van (despite being 6'9"), so the PTS agents, "picked him up by his pants and just **threw him in the van** … from the back of the van to the front of the van **on top of the other guys**."   Even the PTS Agents questioned ACH about Dr. Weintraub's medical condition, and whether he was medically fit for transport on

16

the night of April 24, 2014, per PTS Agent Arnold as set forth in the GBI

Homicide Report:

> The male nurse or doctor in Daviess County first came out and said
> WEINTRAUB was fine for transport.  The doctor said WEINTRAUB
> complained all the time.  ARNOLD observed that when
> WEINTRAUB came out he was **huffing and puffing**. He **looked
> "mental" or not right in the head**. WEINTRAUB was complaining
> that his stomach hurt.  ARNOLD was concerned enough that he
> **asked the nurse** or doctor a **second time** if WEINTRAUB was okay
> and the doctor or nurse said that WEINTRAUB was okay.

All of these above facts demonstrate that ACH, PTS, and their agents and/or

employees, clearly and convincingly, had such an entire want of care so as to give

rise to the presumption of conscious indifference to consequences.

39.

Not only did PTS and ACH exhibit a callous and reckless indifference to the

life and safety of Dr. Weintraub, they even made fun of him, "ARNOLD [PTS

Agent] admitted to **making fun of WEINTRAUB** at the Daviess County

Correctional Facility. …  He did talk with the other PTS employees at the

beginning of the trip and engaged in **mocking WEINTRAUB**. He did so by

**laughing and moaning and groaning**." During transport preparation, PTS agents

shackled Dr. Weintraub, physically threw Dr. Weintraub into the van because he

could not step up on his own, and admittedly mocked and laughed at Dr.

Weintraub as he died a slow and painful death -- demonstrating on the part of the

17

PTS agents and/or employees, clearly and convincingly, such an entire want of care so as to give rise to the presumption of conscious indifference to consequences.

40.

Despite the overwhelming evidence that Dr. Weintraub was experiencing a medical emergency, ACH medically cleared Dr. Weintraub for, and PTS took him away on, an interstate trip with zero medical care (other than one Tylenol by ACH that was given to Dr. Weintraub to "shut him up").

41.

During the early morning hours on April 25, 2014, approximately 15 minutes before pulling into the Union County, GA, Sheriff's Office to drop off inmates, Dr. Weintraub fell over, slumped forward, urinated on himself, and became unresponsive to other inmates in the van.  The inmates called out to the PTS Agents, saying again that Dr. Weintraub needed help -- but the PTS Agents ignored them.

41.

Another fifteen minutes elapsed after arriving at the Union County Sheriff's Office before PTS even checked on Dr. Weintraub.  When PTS finally checked on

18

Dr. Weintraub, PTS's agents found Dr. Weintraub's eyes wide open and bloodshot, that he was pale, his lips were purple, he was unresponsive and he was drooling.

42.

PTS agents checked Dr. Weintraub's pulse on his neck but could not find one.  They then uncuffed Dr. Weintraub to check his pulse on his wrist, but again could not find one.

43.

On April 25, 2014 Dr. Weintraub died in Union County, Georgia, shackled hand and foot, in the back of a crowded PTS transport van.

44.

At 4:13 AM on April 25, 2014, Union County EMS pronounced Dr. Weintraub dead.

45.

The autopsy, performed by the GBI, revealed that the cause of death was a perforated duodenal ulcer resulting in sepsis, a fatal disease process which was allowed to develop unchecked over the course of time and as the direct and proximate result of the negligence, gross negligence, willful misconduct and entire want of care of the agents and/or employees of the Defendants, individually, collectively, and concurrently.

## CAUSES OF ACTION

### COUNT I
### (Negligence --PTS)

46.

Plaintiff hereby re-alleges and incorporates paragraphs one (1) through forty-five (45) above, and 53 – 56 below.

47.

At all times, PTS had and undertook a duty to safely and securely transport Dr. Weintraub from Colorado to South Carolina, to keep him safe and free from harm, to give him reasonable and necessary medical care, and to treat him humanely. Dr. Weintraub was merely being transported to face charges -- allegations against him -- and he had not been convicted of anything.

48.

PTS, by and through its agents and/or employees, breached its duty of care when it failed to provide reasonable and necessary care to Dr. Weintraub, failed to stop at a hospital or other location or take other action that would provide necessary medical evaluation, diagnosis and treatment to Dr. Weintraub for obvious and serious health complaints and concerns, cut off Dr. Weintraub's medications, ignored the obvious physical signs of a serious medical condition,

ignored Dr. Weintraub's and fellow detainees' cries and pleas for help for Dr. Weintraub, and failed to stop or check on Dr. Weintraub when inmates first notified PTS agents that Dr. Weintraub was unresponsive and that he might be dead.  Thus, PTS clearly failed to give Dr. Weintraub the safe transport and referral to adequate medical care that he so desperately needed.

49.

PTS, by and through its agents and/or employees, further failed in its legal obligations and demonstrated additional conduct worthy of imposition of punitive damages when, while openly violating their duties to provide Dr. Weintraub reasonable care, its employees also mocked and mimicked Dr. Weintraub's moaning and groaning, and laughed at his extreme physical pain while he was dying from lack of basic medical care, which not only caused the ongoing and worsening of his physical condition, but also caused him to suffer immense mental pain, suffering, anguish, anxiety, fright and terror on top of his grievous physical pain.   Such conduct clearly and convincingly reveals not only negligence, but willful conduct evidencing a specific intent by agents of PTS to cause Dr. Weintraub psychological and other harm.

50.

As alleged further herein below, Defendant ACH also committed tortious acts and omissions which were a proximate cause of Dr. Weintraub's immense suffering and ultimate wrongful death which renders ACH liable to Plaintiffs, and for which ACH is liable.  As the entity charged with safe transport of Dr. Weintraub from Colorado to South Carolina to face pending charges, however, PTS had duties of care for the entire trip and by consciously choosing to place Dr. Weintraub at the Daviess County Detention Center under the care of its private medical provider, ACH, PTS made ACH its agent in regard to Dr. Weintraub. Accordingly, PTS is further liable, in addition to its own negligence, for any negligence of ACH (as set forth herein and below) and any other person or party in the chain from the time PTS took custody of Dr. Weintraub on April 14, 2014, through the date of Dr. Weintraub's death on April 25, 2014, under principal-agent and vicarious liability doctrines.

51.

As a direct and proximate result of the aforesaid negligence, Dr. Weintraub did not receive the medical care or treatment he required, and he endured a slow, extremely painful and untimely wrongful death, shackled hand and foot in the back of a crowded PTS transport van.  Therefore, PTS is liable to both Plaintiffs in an

amount to be determined by the enlightened conscience of the jury at trial and in an amount greatly in excess of the jurisdictional minimums to confer jurisdiction in this Court.

## COUNT II
**(Medical Negligence against ACH)**

52.

Plaintiff re-alleges and incorporates herein paragraphs 1-52 above.

53.

From April 18 through April 24, 2014 ACH was a private company providing medical care which owed duties of reasonable professional care to its patients, including William Weintraub, as established by the appropriate standard of care in the field of general adult practice/internal medicine, to timely and adequately evaluate and investigate further Dr. Weintraub's complaints of severe abdominal pain, syncopal events, nausea, and vomiting made to ACH staff at the Daviess County Detention Center in Owensboro, Kentucky, to evaluate and investigate further Dr. Weintraub's 46-pound weight loss, and also to evaluate and investigate his profuse sweating and other obvious signs of sickness referenced herein.

54.

It should have been apparent to ACH staff, via the evidence recited herein, and/or the complaints made known to ACH, and/or on the numerous occasions Dr. Weintraub presented to the ACH staff from April 18 through April 24 with complaints of severe abdominal pain, syncope, nausea, vomiting, extreme weight loss, profuse perspiration, and jaundiced skin, that Dr. Weintraub was suffering from an acute infection due the subsequently medically documented duodenal ulcer (and other related findings, such as a necrotic esophagus), which ACH failed to identify and refused to treat and which ultimately perforated, spilling the contents of his gut into his peritoneum through a hole in his duodenum.

55.

Regardless of the root cause of the Dr. Weintraub's perforated duodenal ulcer -- which was progressing and worsening between April 18 and 24, 2014 when Dr. Weintraub was under the medical care of Defendant ACH -- Defendant ACH including its employees, agents, nurses, orderlies, and doctors, should have recognized that Dr. Weintraub was experiencing abnormal and potentially life-threatening gastrointestinal complications that required immediate, emergency medical treatment.

56.

Defendant ACH, by and through its employees, agents, nurses, orderlies, and doctors breached the accepted standard of care and was negligent in at least the following ways:

a.   Failing to perform a proper intake and medical screening as required by law and/or the standard of care when Dr. Weintraub was first admitted to the Daviess County Detention Center;

b.   Failing to provide antacids and/or appropriate medications and/or medical care in light of apparent signs of a severe ulcer;

c.   Failing to have a medical doctor exam and assess Dr. Weintraub in person after Dr. Weintraub's initial visit with ACH on April 23, 2014, when an ACH nurse noted in Dr. Weintraub's file that he was complaining of severe pain in his abdomen, was fidgeting and flailing on the exam table, and was unable to lay still for the exam due to the intense abdominal pain;

d.   Failing to recognize from April 18 to April 24, 2014 that Dr. Weintraub was suffering from an infection most likely due to a puncture, perforation, or other hole/leak in his gastrointestinal tract, whether such hole was caused by a perforated ulcer or other cause;

e.   Failing to order admission for observation and further testing to investigate as well as rule out the cause of his complaints of severe abdominal pain, nausea, and vomiting, extreme weight loss, profuse perspiration, and jaundiced skin; and

f.   Failing to order an immediate transfer to a local emergency room or hospital to have Dr. Weintraub examined and treated;

g.   Clearing Dr. Weintraub for continued transport in a van with other detainees without performing and/or documenting an appropriate medical clearance evaluation.

57.

Though not legally required under the notice provisions of Fed. R. Civ. P. 8(a), the precedent of decisions within this district and the United States District Courts for the Northern District of Georgia, or O.C.G.A. § 9-11-9.1,  Plaintiffs nonetheless, out of an abundance of caution and thoroughness, and to further demonstrate to the Court the merit of their professional negligence claims against ACH even though not required by law to do so in this Court, attach hereto as **Exhibit 1** the Affidavit of Mary Anne Alexander, M.D., a board-certified physician with knowledge, training, education and experience in the care of patients presenting with symptoms like those present with Dr. Weintraub in April

2014.   Dr. Alexander's affidavit sets forth her opinions as to the standard of care applicable to the physician(s) and nurses that were part of the treatment team at ACH in April 2014, as well as breaches of the standard of care which include specific items listed in the previous paragraph as well as additional breaches.   The affidavit of Dr. Alexander is hereby incorporated herein by reference and provides a further basis for all claims made herein against ACH for professional negligence.

58.

If Dr. Weintraub had been properly evaluated and treated by ACH, which would have included Dr. Weintraub being admitted to the hospital for observation, testing, and exploring of the abdomen to locate and repair the emerging defect, Dr. Weintraub most likely would not have died.   This allegation is consistent with and supported by the opinions offered by Dr. Alexander in **Exhibit 1** hereto.

59.

The acts and/or omissions and negligence of Defendant ACH, including its employees, agents, nurses, orderlies, and doctors, individually and in concurrence with the negligence and tortious acts of Defendant PTS, were a proximate cause of the death of William Weintraub, for which Defendant ACH is liable to Plaintiffs in an amount to be determined by the enlightened conscience of the jury at trial, and

in an amount well in excess of the jurisdictional minimum to confer jurisdiction in this Court.

## COUNT III

### (Ordinary Negligence – ACH)

60.

Plaintiff re-alleges and incorporates herein paragraphs 1-52 above.

61.

As expressly allowed by Fed. R. Civ. P. 8(d), Plaintiffs allege in the alternative that Defendant ACH is liable to Plaintiffs under principles of ordinary negligence as well as, or in addition to, professional negligence as alleged in Count II above.

62.

Upon information and belief, in addition to healthcare professionals (i.e., nurses or doctors), ACH employs administrators, managers who are not licensed health care providers or engaged in actually providing medical care but who set administrative policies and procedures applicable to ACH, provide oversight or training, or are involved in corporate decision making in regard to how ACH is run as a business and provides services to its clients.  Plaintiffs allege that these non-healthcare persons were also negligent in failing to provide appropriate systemic

policies, procedure, training, guidelines, incentives, or disincentives to the

employees of ACH so as to be a further cause and contributing factor to the

appalling lack of medical care and treatment of Dr. Weintraub while under the care

of ACH, as alleged further hereinabove.   Even more specifically, Plaintiffs allege

that the corporate negligence of ACH included and emphasized placing profits

ahead of adequate patient care, and that the failure to provide appropriate treatment

to Dr. Weintraub was, in part, due to a desire to not incur costs or expenses that

would be incidental to such appropriate treatment.

62.

Moreover, and also plead in the alternative, the total failure of ACH as an

entity, including all employees, whether health care professionals or not, to

perform basic tasks like performing a proper intake, responding to an Inmate's

Sick Call Request, or providing any remedial care is, or could be determined by the

jury to be, ordinary negligence – i.e., ministerial or administrative failures which

do not even rise to the level of professional failures or breaches.

63.

The systemic corporate negligence of ACH and the ministerial failures of

ACH as an entity, in addition to the professional negligence alleged in Count II by

health care providers at ACH, was also a proximate cause of Dr. Weintraub's

29

immense suffering and ultimate wrongful death, providing an additional basis for ACH to be liable to Plaintiffs in an amount to be determined by the enlightened conscience of the jury trial and well in excess of the jurisdictional minimum necessary to confer jurisdiction in this Court.

## <u>COUNT IV</u>
### (Punitive Damages against Both Defendants)

64.

Plaintiff re-alleges and incorporates herein all preceding paragraphs.

65.

As set forth in the preceding paragraphs, the Defendants' individual, collective and concurrent acts and omissions over an extended period of time in regard to William Weintraub include but transcend negligence, professional negligence and even gross negligence, rising to the level of willful, wanton misconduct and demonstrating an entire want of care such that punitive damages against both Defendants are merited in addition to compensatory damages.

66.

The facts set forth herein clearly and convincingly demonstrate that Defendants had actual knowledge, or with the exercise of even a minimal amount of care should and would have had knowledge, that William Weintraub was

suffering from grave physical illness that required their attention, but they consciously, repeatedly and callously ignored his pleas for help by withholding reasonable medical care until he died in PTS's van during transport.

67.

Indeed, Defendants' repeated willful, wanton conduct described herein would support a jury finding of specific intent by PTS and ACH that William Weintraub suffered harm and ongoing pain without adequate treatment while in their care.

68.

Plaintiff, in his capacity as Administrator and Personal Representative of the Estate of William Weintraub, seeks to recover punitive damages from Defendants for their conduct in an amount determined by the jury based on the evidence at trial in an amount sufficient to punish Defendants and deter them from similar future misconduct.

**DAMAGES SOUGHT**

70.

Plaintiff re-alleges and incorporates herein all preceding paragraphs.

71.

Plaintiff seeks recovery from the Defendants for every element and category of damages permitted under Georgia law to which he is entitled, including, but not limited to, the following:

(a) In his capacity as natural parent and surviving heir of William Weintraub, Plaintiff Robert Weintraub seeks recovery for damages for the wrongful death of William Weintraub, including the full value of his life – economic and non-economic, tangible and intangible;

(b) In his capacity as Administrator of the Estate of William Weintraub, Plaintiff Robert Weintraub seeks damages for the pain, suffering, anxiety, fright, shock, terror, funeral and other bills, and property loss suffered by William Weintraub.

(c) In his capacity as Administrator of the Estate of William Weintraub, Plaintiff Robert Weintraub seeks punitive damages as alleged above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Robert Weintraub prays for the following relief:

(a) That summons issue and service be perfected upon Defendants PTS and ACH requiring both to appear in this Court within the time prescribed by law and Answer this Complaint;

(b)     That Plaintiff recover all compensatory damages – general and special, economic and non-economic – allowed by law from Defendants, in an amount to be determined by the enlightened conscience of the jury and based upon the evidence adduced at trial, in an amount well in excess of this Court's jurisdictional minimum of $75,000;

(c)     That the Estate of William Weintraub recover punitive damages in an amount to be determined by the enlightened conscience of the jury and based upon the evidence adduced at trial;

(d)     That Plaintiff have a trial by jury;

(e)     That all costs be taxed against Defendants; and

(f)     For such other and further relief as is just and appropriate.

**A TRIAL BY JURY IS HEREBY DEMANDED.**

This 16th day of April, 2015.

BY: /s/   *Cale Conley*
        CALE CONLEY
        Georgia Bar No. 181080
        RANSE M. PARTIN
        Georgia Bar No. 556260
        CONLEY GRIGGS PARTIN LLP
        1380 West Paces Ferry Road, N.W.
        Suite 2100
        Atlanta, Georgia 30327
        Phone: 404-467-1155

Fax: 404-467-1166
cale@conleygriggs.com
ranse@conleygriggs.com


***Pro Hac Vice Motion to Be Filed For:***

**CURRY GARY PAJCIC, ESQUIRE**
Florida Bar No.: 0021301
One Independent Drive, Suite 1900
Jacksonville, FL 32202-5013
Telephone: (904) 358-8881
Telefax: (904) 354-1180
Primary E-mail: curry@pajcic.com
Secondary E-mail: nancya@pajcic.com

**ATTORNEYS FOR PLAINTIFF**