**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| ROBERT WEINTRAUB, as Natural Parent and Surviving Heir of WILLIAM WEINTRAUB, deceased, and as Administrator of the ESTATE OF WILLIAM WEINTRAUB, | ) ) ) ) | Civil Action<br><br>File No. 1:15-cv-01213-AT |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| ADVANCED CORRECTIONAL HEALTHCARE, INC. a foreign corporation, and PTS of AMERICA, LLC, a foreign limited liability corporation, | ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT PTS OF AMERICA LLC'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Robert Weintraub, as surviving father of William Weintraub, and as

Administrator of the Estate of William Weintraub, hereby files this opposition to

the Motion for Summary Judgment of Defendant PTS of America, LLC ("PTS").

As discussed below, there is substantial evidence from discovery to date[1] that PTS

---

[1] Discovery is ongoing, with depositions of a PTS detainee eyewitness and another PTS driver set in the next month, and experts to be disclosed after fact witness discovery.  The evidence to date is more than sufficient to deny summary judgment on the direct liability claims against PTS, but to the extent the Court considers granting summary judgment on the existing evidence, Plaintiffs submit that it should defer ruling until discovery is complete and all facts are before the Court.

had, knew it had, and willingly undertook ongoing duties of reasonable care to William Weintraub ("Weintraub") when it took full custody and control of him as a motor carrier transporting him from Colorado to South Carolina.  There is also substantial evidence (cited below) from which a jury could reasonably conclude that PTS breached the duties it had and undertook as to Weintraub, who suffered and died while in a PTS van during transport.  Thus PTS' motion for summary judgment (Dkt. 71, 71-1) as to the direct claims of negligence against it (See e.g. Plf. Amd. Cmplt., Dkt 14, ¶¶ 48-50), which motion is based solely on a claimed "lack of duty" to Weintraub while he was in its custody, should be DENIED.

Aside from their direct negligence claims, Plaintiffs also alleged in their Amended Complaint (see e.g. id., ¶ 51) that PTS is vicariously liable for the acts and omissions of co-defendant Advanced Correctional Healthcare ("ACH") because PTS made ACH its "agent" when PTS decided to drop off its charge, Weintraub, for six days in Kentucky at a detention center where it knew (or should have known) that ACH would be providing health care.  As noted, Plaintiffs contend that PTS' direct duties of reasonable care to Weintraub existed throughout his entire journey in PTS' custody, including his time in Kentucky (where PTS chose to place him) and continued on the PTS van ride leading to his death in Georgia.  PTS is directly liable for all the decisions that its own employees made

(or did not make) which contributed to Weintraub's unnecessary death.  However, based on the discovery to date from ACH and PTS since the filing of the PTS vicarious liability claim in the Complaint, and for judicial efficiency and a good faith to attempt to streamline the issues before the Court for decision, Plaintiffs hereby withdraw their claim that PTS is vicariously liable for the negligence of ACH.  Plaintiffs will continue to pursue their asserted direct claims against both PTS and ACH, as concurrent and joint tortfeasors, but not as entities with a legal principal-agent relationship between them giving rise to vicarious liability. Accordingly, the aspect of PTS' current motion seeking summary judgment on Plaintiff's vicarious liability claims against PTS for ACH's conduct is MOOT, neither the Court nor the parties need to expend further time or effort on that part of the motion, and Plaintiffs will not address those issues here.

## I.     THE CLAIMS:  RESPONSE TO PTS' DESCRIPTION OF PLAINTIFFS' CLAIMS AND CLARIFICATION OF THE NATURE OF THE DUTIES PLAINTIFFS CONTEND PTS HAD AND UNDERTOOK AS A CARRIER OF DETAINEES

Repeatedly in its brief, PTS attempts to mischaracterize and limit Plaintiffs' claims against it to only a claim that PTS "failed to provide medical care," (PTS Brief, p. 2) or for "its agents' negligent failure to provide medical care" (id., p. 6) or a claim that PTS was "legally obligated to provide medical care." (Id., p. 8). Indeed, that attempt to narrow the Plaintiffs' claim is the lynchpin of PTS' motion.

In doing that, PTS suggests that Plaintiffs somehow claim PTS driver/agents had a duty to be professional health care providers who could actually diagnose Weintraub's specific medical condition and perform a proper surgery or medical intervention on him in the van or on the side of the road.  But that is not Plaintiffs' claim against PTS.

Plaintiffs' claims against PTS are for ordinary negligence (not medical negligence) arising from PTS' role as a motor common carrier of passengers – a carrier that has and undertook a duty to provide safe transport of passengers, observe them, treat them with respect, and take them for medical care if needed.  See Dkt. 14, First Amended Complaint, and in particular ¶¶ 6, 13, 15, 17-18, 48-50.  While that negligence claim of course includes the allegation that PTS had a duty to exercise "care" to Weintraub as its charge, Plaintiffs have not alleged that PTS was a health care provider with a duty to "provide *medical care*" to Weintraub itself.  Instead, Plaintiffs allege that "PTS had and undertook a duty to safely and securely *transport* Dr. Weintraub," and that PTS breached that duty when it, among other things, "failed *to stop at a hospital or other location* or take other action that *would provide* necessary medical evaluation, diagnosis and treatment to Dr. Weintraub…."  (Id., ¶ 49) (emphasis supplied).  Even more specifically, Plaintiffs contend that PTS' agents "ignored the obvious physical

signs of a serious medical condition," and "failed to give Dr. Weintraub the safe transport *and referral to adequate medical care* that he so desperately needed." (Id.) (emphasis supplied).

As those quotes from the Amended Complaint make clear, Plaintiffs allege **not** that PTS had a duty to actually "provide medical care" itself as PTS now repeatedly suggests, but that PTS had very basic duties: to keep an eye on the detainees in its custody (who are shackled and unable to get care for themselves) and if concerns arise, *take them* to a hospital or health care provider that *would* deliver medical care. That difference is critical, and the reason PTS seeks to "recast" Plaintiffs' claims about "duty" into something they are not seems clear – PTS wants to concoct some way to avoid a mountain of evidence from its own agents and own documents confirming that PTS has, and clearly undertook, duties of care to Mr. Weintraub to observe him and get him access to medical care when it was hired to, and undertook to, transport him as a common carrier.

Additionally, PTS' "no duty to provide medical care" argument ignores Plaintiffs' claim (see id. ¶ 50) that PTS violated a duty of ordinary care to its detainees and caused further emotional harm by intentionally mocking Weintraub and laughing at his condition as he suffered horribly in the PTS van. That aspect of Plaintiffs' claims has nothing to do with a duty of "medical care" and is instead

5

rooted in longstanding common law principals that one person owes to another a duty to not engage in unreasonable conduct which causes harm.  See, e.g., Bradley Ctr., Inc. v. Wessner, 250 Ga. 199, 201 (1982) (recognizing "the general duty one owes to all the world not to subject them to an unreasonable risk of harm.")  Given that PTS does not even attempt to address this aspect of Plaintiffs' negligence claim, it certainly has not carried its burden to obtain summary judgment on that aspect of the claim.  Under any scenario, Plaintiffs' claims for damages for PTS' mockery of Weintraub in the last hours of his life is properly for the jury to consider and not a proper subject for summary judgment.

## II.   THE EVIDENCE: PTS TESTIMONY AND DOCUMENTS DEMONSTRATE KNOWLEDGE OF AND UNDERTAKING OF DUTIES TO TRANSPORT DETAINEES SAFELY, OBSERVE THEM, AND PROVIDE ACCESS TO CARE

PTS is paid to transport prisoners or detainees from one point to another across the country, and it is a "priority" to PTS that it transport such persons "safely."  Nolan Roberts Depo., p. 8/15-24 (cited portions attached hereto as Exhibit A).  In the words of Mr. Roberts, one of three PTS agents transporting William Weintraub on April 24-25, 2014, the "job" of a PTS driver/agent encompasses not just driving, but also to "make sure the people that we're carrying are fed," that "they stay safe," and that "*if they request medical attention, do what we can to get them medical attention.*"  Id., p. 10/6-15 (emphasis supplied).  And,

as reflected by its website and the testimony of another driver of Weintraub, PTS

knows that part of its "core focus" is (or should be) safety.  See Exh. 1 to Mark

Davis Deposition (PTS Website "Services" page), attached hereto as Exhibit B;

Davis Depo. pp. 8/12-9/1, cited portions attached hereto as Exhibit C.  PTS

expressly represents to the world that "we understand safety," that "PTS Staff will

coordinate everything and provide around the clock oversight and support to our

agents on the road," and that "we go the extra mile to ensure staff *and detainees*

*safety* every step of the way" with "agents [who] understand the importance of

safety, timeliness and efficiency" and who are "trained and compensated to

achieve excellence in each of those categories."  See Exh. B hereto (PTS Website

"Services" page) (emphasis supplied).

As part of its attempt to effectuate the responsibilities it undertakes for

detainee safety as touted on its website, PTS has a policy, procedures and

operations manual that was made available to agents Davis and Roberts.  See Exh.

2 to Mark Davis Depo. (PTS Manual), attached hereto as Exhibit D.[2]  In the

manual, PTS recognizes and requires of its agents a litany of responsibilities to

detainees in terms of access to medical care, and indeed PTS recognizes in its own

---

[2] See also Davis Depo., pp. 12/3-13/20 (acknowledging receipt and familiarity with
policy manual); Roberts Depo., pp. 14/13-19 (acknowledging receipt of manual
during training).

words that "the *primary function of PTS* is to transport prisoners in *the most safe and secure environment possible*." Id., p. 39 (emphasis supplied).[3]

To that end, it is PTS policy that "[a]gents will maintain constant awareness of prisoner conduct, behavior, attitude and moods," (Exh. D, p. 13), that agents "should remain alert and take note of any unusual prisoner sounds or movements," (id. p. 14), and that the driving agent "must be conscious of his/her *responsibility* to the passenger *and the prisoners*." (Id., p. 16) (emphasis supplied). Even more importantly for purposes of this case and this motion, PTS recognizes its agents' responsibilities for "safety" include delivering a patient *to others* for medical care when needed: "An inmate must be taken to a Hospital if request is made for medical care." Id., p. 28. Further, PTS advises its agents that "in the event that a prisoner develops a medical condition that is life threatening or sustains a life

---

[3] To be very clear, Plaintiffs are <u>not</u> alleging that these internal PTS policies, website representations or training materials by themselves create a legal duty or that violation of internal company policies is negligence per se. Rather, Plaintiffs cites these policies because they are very material evidence from which the Court and a jury can reasonably conclude that PTS undertakes to "render services to another which [PTS] should recognize as necessary for the protection of a third person," which in turn subjects PTS to a duty to, and liability to, such a third person (Weintraub) when harm results from its failure to exercise reasonable care in its undertaking.  <u>See</u> Restatement 2d Torts § 324A, as specifically adopted in <u>Huggins v. Aetna Cas. & Sur. Co.</u>, 245 Ga. 248, 248 (1980), and further discussion *infra*.  Clearly, PTS policies and training materials support its recognition that the services it provides are "necessary" for the "protection" of detainees from harm, or PTS would not have the policies or highlight "safety" in all of its materials.

threatening injury this constitutes an emergency and the agent may transport the prisoner to an emergency room immediately." (i.e., without even needing approval to do so).  Id., p. 27.  PTS vans are required to be equipped with first-aid kits (id., p. 15), its agents are trained on CPR and First Aid (id., p. 4), and PTS recognizes that "to provide a safe, secure and humane environment for the transportation of special needs prisoners PTS shall provide *the best possible special care that corresponds to the particular problem or physical/mental impairment of the prisoner*."  Id., p. 26 (emphasis supplied).

Separate from issues related to physical health or access to medical care, PTS' policy manual also recognizes that it has and undertakes duties to treat detainees with decency and respect: "an agent should always act in a professional manner," (id., p. 28), "agents are never to use abusive language," (id., p. 15), and agents are to "refrain from participating in any…immoral, or disgraceful conduct, behavior or activity…." (Id., p. 36).  Thus, PTS also recognizes and undertakes a responsibility and duty to not mock, demean or otherwise inflict emotional distress on detainees in its custody.

Beyond the manual, PTS' training presentations similarly recognize their knowledge of the importance of safety and that "Prisoners have the Right to be Transported in a Safe, Secure and Humane manner," as well as "the Right to

9

Receive Medical Treatment" and "the Right to be Free From

Harassment." <u>See</u> PTS Extradition Overview Presentation, Exhibit 8 to Roberts

Depo., and attached hereto as Exhibit E.  PTS' "Policy on Humane Treatment of

Inmates" required that all PTS employees follow policies, procedures and training

to the letter, and similarly requires that Prisoners be free from harassment, to be

free from cruel and unusual punishment, to have the right to receive medical care

and treatment, and to have the right to be transported in a safe, secure and humane

manner.  <u>See</u> PTS Policy on Humane Treatment of Inmates, Exhibit 3 to Davis

Depo. and attached hereto as Exhibit F**.**   Roberts confirmed that the contents of the

PTS training materials were "taught in training," and he agreed that "it is important

for PTS agents to know and understand all the policies and procedure and to know

and understand and protect the rights of prisoners."  Roberts Depo., p. 25/6-26/23.

Based on the above-cited testimony and PTS documents alone, there is

substantial evidence upon which this Court and a jury can reasonably find that PTS

knew it had, and purposefully undertook, multiple duties of care to William

Weintraub as a detainee in PTS custody – including remaining "alert" and taking

note of concerning noises or movements, transporting him for medical care if

needed, and treating him with dignity and respect while in custody.

### III.    APRIL 24-25, 2014: WEINTRAUB IS IN OBVIOUS DISTRESS, BUT PTS AGENTS TRANSPORT HIM ANYWAY, REPEATEDLY BREACH THE DUTIES OF CARE THEY ADMITTEDLY HAD AND UNDERTOOK TOWARD HIM, AND WEINTRAUB DIES IN THE PTS VAN

The Horry County Sheriff's Office hired PTS to deliver Dr. Weintraub safely from Colorado to Horry County, South Carolina to face criminal charges.[4]  See Dkt 71-1 (Def. Brief), p. 4, and Exh. E thereto.  On April 18, 2014, PTS deposited Weintraub at DCDC in Kentucky, where he stayed for six days and complained repeatedly of intense stomach pain, among other symptoms.  See Exhibit 2 to Kim Stacy Depo. (medical records of ACH for Weintraub), attached hereto as Exhibit G.  On the evening of April 24th, PTS agents Davis, Roberts, and Trevis Arnold arrived at DCDC to pick up Weintraub (and others) to continue his trip to South Carolina.

According to multiple accounts from lay eyewitnesses present just before Weintraub was loaded into the PTS van, including the PTS agents themselves, Weintraub was exhibiting signs and symptoms that were obvious and concerning to anyone as to his health and safety.  PTS agent Davis saw Weintraub "sweating bullets" before being loaded in the van, and that he was pale. Davis Dep., 27/21-

---

[4]  PTS' "facts" section attempts to portray Weintraub's criminal charges in a bad light, which is irrelevant.  Even if he had been convicted of a heinous crime – which he was not – PTS still had and undertook a duty of care in transporting him.

28/5.  PTS agent Roberts heard complaints of stomach pain.  Roberts Dep., 34/19-

23. Anthony Russ, an ACH medication aide, observed Weintraub "didn't look

right at all," and was pale, cold and clammy. Russ Dep., p. 17/1-18/10 (cited

portions attached hereto as Exhibit H).   Other PTS transports being loaded on the

same van unanimously (and even more graphically) confirmed the obviousness of

Weintraub's distressed condition even to a lay person, describing him as "sweaty,

white in color, groaning and looking like the 'walking dead'" (see Exh. 9 to

Danielle Board depo., summary of GBI interview of Holly Dean), that he was

groaning, "off" mentally and looked like "death," (see Exh. 11 to Mary Capps

depo., summary of GBI interview of Judy Waldrep), and that he was "complaining

of pain the whole time," pale, sweating profusely, and had "bulging eyes" (see

Exh. 10 to Mary Capps depo., summary of GBI interview of Ann Bremen).

A jury could reasonably determine from the multiple accounts cited above

that Weintraub had "special needs" that were obvious to even a lay observer.

Under PTS policy, "[i]f the agent arrives at a pick-up and discovers that a special

needs prisoner is to be transported, the agent should contact headquarters for

instructions."  Exh. D, p. 28 (subsection "H").  The PTS agents did not contact

headquarters for instructions regarding Weintraub. Davis Depo. pp. 32/15–23,

60/5–13; Roberts Depo. pp. 41/4–16.  They also did not receive written medical

authorization from any health care provider that it was safe to transport Weintraub on April 24th.  Davis Depo. pp. 32/12 – 14, 52/9–15; Roberts Depo. pp. 69:6–15, 72/24–73/3.  Instead, the PTS agents shackled him, hoisted him into the PTS van, and took off down the road.

The violations of the duties PTS agents had and undertook, as evidenced by their testimony and policies, continued on the drive toward Georgia.[5]  They did not remain constantly aware of Dr. Weintraub's conduct, behavior, attitude or mood. Davis Depo. pp. 33/18–34/3, 36/5–14; Roberts Depo. pp. 54/25–56/7, 48/8–50/7, 57/10–58/21. They did not check on Dr. Weintraub en route or remain alert to his sounds or movements. Roberts Dep. at 45/23–9, 47/4–13. They did not call headquarters or anyone else from the road concerning Weintraub. Roberts Depo. pp. 41/4–16; Davis Depo. pp. 32/15–23, 60/5–1.  They did not stop and take him for medical care in an emergency. Roberts Depo. pp. 76/23–77/14, 43/2–45/10. Instead, they mocked him and disrespected him to his face. Davis Dep. at 43/12– 45/12; Roberts Dep. at 42/18–43/11, 54/9–24, 78/25–2.

---

[5] A company's failure to abide by its own policies is evidence of negligence. <u>See</u> <u>McKeel v. State Farm Mut. Auto. Inc. Co.</u>, 619 Fed. Appx. 849 (2015); <u>Luckie v. Piggly-Wiggly Southern, Inc.</u>, 173 Ga. App. 177, 177 (1984) ("Privately established rules are admissible as illustrative of negligence. . .").

In the absence of being provided access to any medical care as he was shackled in the van, the foreseeable occurred: Weintraub was found, dead, in the back of the PTS van when they arrived at the Union County jail in Blairsville, Georgia around 4 a.m. to deliver another detainee into custody there. Roberts Depo. pp. 47/17–48/2.  A GBI-requested autopsy confirmed that Weintraub did not die from some sudden trauma en route:  he died of a perforated duodenal ulcer that had festered for so long it caused 1600 cc of fecal matter, necrosis of the esophagus, and widespread sepsis to eat away at Weintraub's abdominal cavity and cause intense suffering and death.  See Autopsy Report, Def. Brief, Exhibit I.

## IV.   LEGAL ARGUMENT AND CITATION OF AUTHORITY

### A.   Legal Standard – Summary Judgment

District Courts are not permitted to grant summary judgment unless the pleadings and supporting documents "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Defendant PTS bears the burden of establishing that there is no genuine dispute of material fact; and all facts are viewed and reasonable inferences drawn in the light most favorable to Plaintiffs. Scott v. Harris, 550 U.S. 372, 378 (2007). If more than one inference can be reasonably drawn from the facts and evidence, then the issue is properly reserved for the trier of fact and

summary judgment must be denied. <u>WSB-TV v. Lee</u>, 842 F.2d 1266, 1270 (11th Cir. 1988).  Here, particularly viewed in light most favorable to Plaintiffs, the facts preclude summary judgment because, as applied to controlling law, they establish that PTS had, and undertook, duties of care to Weintraub (and also negligently performed the duties they had and undertook).

      B.    <u>PTS Had Duties of Care to Weintraub That Arise From Two Different Sources Under Georgia Law</u>

As Defendant's own brief acknowledges, a legal duty sufficient to support liability in negligence is "either a duty imposed by a valid statutory enactment of the legislature or a duty imposed by a recognized common law principle. . ." Def. Brief, p. 7 (quoting <u>Rasnick v. Krishna Hospitality, Inc.</u>, 302 Ga. App. 260, 263 (2010).   Here, PTS had both statutory and common law duties to Weintraub, and while both apply to PTS, either duty is sufficient to defeat the PTS motion.

      *1.*    *PTS is a Common Carrier of Passengers With a Statutory Duty To Exercise Extraordinary Diligence To Its Passengers*

PTS holds authority from the Federal Motor Carrier Safety Administration as a "Motor Passenger Common Carrier" with docket number MC689407; its "authority" has been in good standing since November 2012, well before the subject events.  <u>See</u> FMCSA Registration for PTS, p. 1 ("Common Authority: Active") and p. 8 (Authority Type:  Motor Passenger Common Carrier, reinstated

11/29/12), attached hereto as Exhibit I.[6]  Weintraub was, indisputably, a

"passenger" being transported by PTS.  Def. Brief, p. 5 ("on April 24, 2014, the

decedent boarded another PTS van….")

O.C.G.A. § 51-1-6 is a "valid statutory enactment."  It provides:

"When the law requires a person to perform an act for the benefit of another
or to refrain from doing an act which may injure another, *although no cause
of action is given in express terms*, the injured party may recover for the
breach of such legal duty if he suffers damage thereby."

(italics supplied).

O.C.G.A. § 46-9-132, a valid statutory enactment, is a "law" that requires

the performance of "an act for the benefit of another."  Specifically, it provides:

"A carrier of passengers must exercise extraordinary diligence to protect the
lives and persons of his passengers but is not liable for injuries to them after
having used such diligence."

Similarly, O.C.G.A. § 46-9-1, a valid statutory enactment and law that also

requires the performance of an act for benefit of others, provides:

"Carriers as such are bound to exercise ordinary diligence.  Common
carriers as such are bound to use extraordinary diligence, and in cases of loss

---

[6]  This registration form is a public government record and can be viewed or
downloaded at http://li-public.fmcsa.dot.gov/LIVIEW/pkg_carrquery.prc_getdetail
by inputting PTS' MC Docket Number and clicking on "report" once the "Carrier
Search" page appears. That official DOT website is the source of Exhibit I hereto,
downloaded 5/27/16.

the presumption of law is against them, and no excuse avails them unless the loss was occasioned by the act of God or the public enemies of the state."[7]

While neither of the above statutes in title 46 create a "cause of action" in "express terms," that is not needed – both are laws requiring a person (a carrier) to perform an act for another (diligence to another, i.e., passengers like Weintraub). Under the plain language of O.C.G.A. § 51-1-6, a breach of the duty(ies) created by such laws gives an injured party the right to seek recovery for such breach. That is exactly what Plaintiffs are doing here, and the duty on PTS is one created by statutes read *in pari materia*.   That really can, and should, end the issue.

In its brief at p. 11, however, PTS recognizes the existence of both of these clear duty-creating statutes, but seeks to escape their application to PTS with a reference to O.C.G.A. § 46-1-4.  PTS boldly claims that "neither of these statues applies to PTS because 'the provisions of [Title 46 of the Georgia Code] relating to carriers engaged in the transportation of passengers or goods within this state shall not apply to carriers engaged in interstate commerce."   That sentence *seems* really compelling for PTS, but it has a huge and fatal problem:  it is an incomplete quote to O.C.G.A. §46-1-4 that omits incredibly important language right before the

---

[7] PTS is clearly a "common carrier" based on its FMCSA registration, but even if deemed only a "carrier," it would still have a duty – ordinary diligence – which is sufficient to defeat PTS' motion here based on a claim of "no duty" at all.

language quoted by PTS.  The complete statute, with the part omitted by PTS in

italics to show exactly what was left out, reads as follows:

> *Unless otherwise provided by Georgia law and not preempted by* *federal law* <u>*or unless provided or allowed by federal law*</u>*,* the provisions of this title relating to carriers engaged in the transportation of passengers or goods within this state shall not apply to carriers engaged in interstate commerce.

(emphasis added).  What the omitted language means is that title 46 and the duties

set forth therein ***are*** applicable to interstate carriers engaged in the transport of

passengers within Georgia if "provided *or allowed by* federal law."

     Federal law clearly allows Georgia to promulgate laws related to passenger

safety like those in title 46. The Federal Motor Carrier Safety Regulations provide

that "except as otherwise specifically indicated, subchapter B of this chapter i*s not*

*intended to preclude States or subdivisions thereof from establishing or enforcing*

*State or local laws relating to safety . . .*" 49 CFR § 390.9. (emphasis supplied)

Thus, federal law does not preclude state laws related to safety, and indeed

expressly allows states to establish and enforce "laws relating to safety," which

O.C.G.A. §§ 46-1-132 and 46-1-9 clearly are.  Thus, Georgia's applicable standard

of care or "duty" for carriers of passengers – extraordinary diligence – applies to

PTS in Georgia and in this case, and placed upon PTS a statutory duty to protect

the "lives and persons of [its] passengers," including Weintraub.  The evidence

cited above that PTS has internal safety policies, touts safety as a "primary function," and tells its drivers to keep passengers safe is proof that contrary to their legal argument now to escape liability, PTS as a company knows that it has the exact duties required by Georgia law – protection of passengers – and that is why it enacted those policies and training methods.

The clear language of the Georgia statutes create a high duty of care on PTS as a common carrier and federal law clearly allows that duty of safety to exist at the state level such that O.C.G.A. § 46-1-4 does not apply.  But if solely for the sake of argument one was to claim the statutes are not clear for some reason, even that does not help PTS because the next step would be to discern the intent of the legislature to find meaning and application.[8]  In that regard, PTS' argument – that Georgia duties of diligence to its passengers do not apply to it or any other "interstate carrier" while they are driving through Georgia, and that PTS has some sort of phantom immunity from suit by its passengers when harm befalls them while riding through Georgia – is contrary to the obvious statutory intent of both Georgia and federal law.  O.C.G.A. §§ 46-1-9 and 46-1-32 both have, at their core, an intent to promote safety of passengers (or goods) which are being carried by

---

[8] See, e.g. <u>Fulton County Bd. of Tax Assessors v. Greenfield Inv. Group, LLC</u>, 313 Ga. App. 195, 197 (2011) ("Cardinal rule" of statutory construction is to ascertain the legislative intent and give it a construction to effectuate the intent).

another.  The same intent is evident in federal transportation law, as the promotion

of safety and cooperation between state and federal entities is of utmost

concern. See, e.g., 49 U.S.C.A. § 13101(a) ("…it is the policy of the United States

Government to verse the modes of transportation and – (1) in overseeing these

modes . . . (B) to promote safe, adequate, economical, and efficient transportation;

. . . (E) to cooperate with each State and the officials of each State on

transportation matters . . .; (2)(C) meet the needs of shippers, receivers, passengers,

and consumers; (3) to cooperate with the States on transportation matters . . .").[9]

Under both the language and the intent of the state and federal laws, the legal

duties of a common carrier attach to PTS here and preclude summary judgment.

> 2. <u>PTS has a Legal Duty For the Negligent Performance of An
> Undertaking Under Georgia Common Law Adopting 2d Restatement
> of Torts §324A</u>

PTS spends a fair amount of its argument discussing 2d Restatement of

Torts § 314A and arguing that it has been "declined" in Georgia, but that entire

argument misses the mark:   Plaintiffs are not relying on that Restatement section

---

[9] <u>See also</u> 49 U.S.C.A. § 31100 ("The purpose of this subchapter is to ensure that
the Secretary, States, and other political jurisdictions work in partnership to
establish programs to improve motor carrier, commercial motor vehicle, and driver
safety to support a safe and efficient transportation system . . ."); <u>Specialized
Carriers & Rigging Assoc. v. Com. of VA., C.A.4</u>, 795 F.2d 1152, 1156 (Fourth
Circuit finding that the FMCSA was not intended to preempt the entire field of
interstate highway safety or to preempt any state statute or regulation, the
implementation of which would be compatible with federal regulation).

as a basis for their claim of common law duty of "undertaking."  Nor do Plaintiffs need to, because Georgia courts have expressly adopted a different 2d Restatement of Torts Section -- §324A:  Liability to Third Persons for Negligent Performance of an Undertaking – that applies to PTS and the facts of this case to impose a common law duty, and liability, upon PTS.

> Over 35 years ago, the Georgia Supreme Court expressly stated:
>
> "We hereby adopt the majority rule as stated in the Restatement 2d Torts §324A: Liability to Third Person for Negligent Performance of Undertaking. One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

Huggins v. Aetna Cas. & Sur. Co., 245 Ga. 248, 248 (1980). The facts here align squarely to the application of this common law rule to PTS, as can be determined by answering six questions that track the "elements" of the adopted Restatement:

      **1.  Did PTS undertake, gratuitously or for compensation, to render services to another?**

Yes.  The Horry County Sheriff's Office sought Weintraub's presence in South Carolina, obtained an order that extradited him, and hired PTS to transport

him from Colorado.  Thus, PTS was clearly "rendering services" for "another"

(here, Horry County is the "other" and the services were for compensation).

> ### 2. Should PTS have recognized that the services it was rendering were for the protection of a third person?

Yes, and here is where the PTS policies, training manuals, website

statements and agent admissions are particularly material.  All of those things cited

in the initial fact sections above concerning PTS' policies, including but not

limited to those requiring transport for medical care at a hospital, are sufficient to

allow this Court and a jury to find that PTS should have recognized that its services

included as a "primary function" the safety and protection of a third person – here

Weintraub.  The existence of a statute requiring a similar duty of protection to

passengers serves as further evidence that PTS should have recognized the nature

of its services including protection of third persons like Weintraub.

> ### 3. Did Physical harm result to the third person (Weintraub) from PTS' failure to exercise reasonable care?

Yes.  Based on the autopsy findings and the accounts of multiple

eyewitnesses already cited, Weintraub was in a dire physical state and complaining

of pain and other symptoms as he boarded the PTS van.  A jury could very

reasonably find on this record (and more to be developed as discovery continues)

that Weintraub suffered worsening physical harm because PTS failed to exercise

reasonable care, observe him appropriately, and take him *somewhere* for medical care to address obvious and concerning noises and signs. As a specific example, if PTS had simply recognized he was in obvious pain and taken him to a hospital, something could have been done *at that point* to stop or alleviate his pain or repair the festering ulcer.  Because PTS failed to do what its own policies confirm it should have done, however, the physical pain continued for hours, the perforated ulcer grew, and more harmful gastric contents were dumped into Weintraub's abdomen.  Thus, PTS' failure to act caused "physical harm" to result and to worsen as he rode down the highway to the point it became fatal sepsis and led to death.

The answers to the above three questions satisfies the first half of §324A, and leads the legal analysis to the three *alternative* ways that liability can attach to the entity undertaking to render services.  The adopted Restatement separates each of these three ways with an "or," signifying that if *any one of them is met*, then a duty attaches.   Plaintiffs submit that all three are satisfied here, but note that the Court need only find there is evidence creating issues of fact on one (or more) of them for summary judgment to be improper.

### 4. Did PTS' failure to exercise reasonable care increase the risk of harm?

Yes, as already discussed.  Though Weintraub was clearly suffering "harm" earlier while in the care of ACH in the form of pain, vomiting and other symptoms,

PTS's failure to use reasonable care to protect him absolutely increased the "risk of harm" (and suffering).  Indeed, a jury would be compelled by these facts to find that in the absence of being taken somewhere by PTS for medical intervention, Weintraub's "risk of harm" worsened the longer he traveled down the road and in fact increased to the point he suffered the ultimate harm:  death.  Thus, jury issues exist on this prong, and its motion should be denied on this ground alone.

**5. Did PTS undertake to perform a duty owed by the other (here, Horry County) to the third person (here, Weintraub)?**

Yes.  The Horry County Sheriff's Office, as a state government law enforcement agency, has constitutional duties to pretrial detainees or prisoners such as Weintraub.  Here, PTS does not dispute that Horry County hired PTS to perform its transport function, nor can it dispute that PTS undertook to perform that function for Horry County for hire.   This prong is easily met, rendering summary judgment on the issue of a "duty" inappropriate.

**6. Was harm suffered because of reliance of the other (Horry County) or the third person (Weintraub) on the undertaking?**

Yes.   Clearly, Horry County was relying upon PTS to handle transport of the prisoner it expedited, and as PTS represents on its website, it knows (and tells others) that its "core focus" is safety. Here, increased harm was suffered because PTS continued the undertaking (transport) rather than acting reasonably and

getting Weintraub to medical care.  Similarly, Weintraub was shackled in the van and *totally reliant* on PTS for anything and everything as he went down the road. He relied on PTS to treat him humanely and with respect, and they did not, causing him harm.   This prong is easily satisfied.

      C.     <u>Brief response to Cases Cited by PTS</u>

This is a case involving unique facts, which as applied to the statutory and common law "duty" principles set forth above, compel a denial of summary judgment.  Plaintiffs can thus respond to the various cases PTS cited very succinctly:  not one of those cases involves a common carrier of passengers, none involved a defendant who was in direct physical proximity of the plaintiff with direct knowledge of his dire condition and then failed to act even with such knowledge, none had a defendant that touted its responsibilities for safety of its detainees, and none involved the application of Restatement § 324A.  Thus, none of those cases require, or even support, a grant of summary judgment on these facts under Georgia law.   Summary judgment on the direct claims against PTS is properly denied.

      Respectfully submitted, this 27th day of May, 2016.

                             CONLEY GRIGGS PARTIN LLP

                             <u>/s/ Cale Conley</u>
                             CALE CONLEY

Georgia Bar No. 181080
RANSE M. PARTIN
Georgia Bar No. 556260
ALYSSA BASKAM
Georgia Bar No. 776157

1380 West Paces Ferry Road, N.W.
Suite 2100
Atlanta, Georgia 30327
Phone: 404-467-1155
Fax: 404-467-1166
cale@conleygriggs.com
ranse@conleygriggs.com
alyssa@conleygriggs.com

PAJCIC & PAJCIC, PA

/s/ Curry Pajcic
CURRY GARY PAJCIC (*pro hac vice*)
Florida Bar No. 0021301
ROBERT LINK (*pro hac vice*)
Florida Bar No. 200743

1 Independent Drive
Suite 1900
Jacksonville, FL 32202
Phone: 904-358-8881
Fax: 904-354-1180
curry@pajcic.com
bob@pajcic.com

ATTORNEYS FOR PLAINTIFF

26

## <u>CERTIFICATE OF PROPER FORMAT</u>

This is to certify that the foregoing was prepared in Times New Roman, 14-point font, in accordance with Local Rules 5.1 and 7.1(D).

This 27th day of May, 2016.

**CONLEY GRIGGS PARTIN LLP**

/s/  *Alyssa Baskam*
ALYSSA BASKAM
Georgia Bar No. 776157

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this date filed and served the foregoing

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT PTS OF AMERICA'S**

**MOTION FOR SUMMARY JUDGMENT** through the Court's CM/ECF filing system

which will automatically serve a copy of said pleading upon all counsel of record.

This 27th day of May, 2016.

**CONLEY GRIGGS PARTIN LLP**

/s/  *Alyssa Baskam*
ALYSSA BASKAM
Georgia Bar No. 776157

28