# EXHIBIT A

Nolan Roberts
May 14, 2016

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF GEORGIA

3              ATLANTA DIVISION

4    _____

5

ROBERT WEINTRAUB, et al,
6

7        Plaintiffs,

8    VS.                    NO. 1:15-cv-01213AT

9

10   ADVANCED CORRECTIONAL
     HEALTHCARE, et al,
11

12       Defendants.

13   _____

14              DEPOSITION

15                 OF

16            NOLAN ROBERTS

17        Saturday May 14th, 2016

18

19

20

21

22

23

24

25

1   military, too.

2      Q.   Yeah?  Excellent.  What time did --

3   when did you start working for PTS?

4      A.   I want to say March of 14.

5      Q.   Okay.  How long were you there for?

6      A.   Just a couple of -- two to three

7   months.

8      Q.   Okay.  So at the time of this incident

9   you hadn't really been there all terribly long,

10  either?

11     A.   No, ma'am.

12     Q.   More than Mr. Davis?  So you weren't

13  still this training like he was?

14     A.   No, ma'am, I was not.

15     Q.   Okay.  Excellent.  PTS of America, as

16  far as you know, it is a company that transports

17  people across the country.

18     A.   Yes, ma'am.

19     Q.   Specifically prisoners, detainees, that

20  sort of thing?

21     A.   Yes ma'am.

22     Q.   It is a priority for them to do so

23  safely?

24     A.   Yes, ma'am.

25     Q.   Okay.  We'll go ahead and do -- I'm

```
 1  right.
 2  BY MS. BASKAM:
 3      Q.   So would you agree that that is what
 4  PTS -- something that PTS cares about?
 5      A.   Yes, ma'am.
 6      Q.   And so what was your job at PTS?
 7      A.   I was a driver and, slash, agent, I
 8  guess, that encompasses driving, make sure the
 9  people it that we're carrying are fed, they stay
10  relatively safe -- I'm not going to say
11  "relatively safe," they stay safe.  If they
12  request medical attention, do what we can to get
13  them medical attention.  Sign them in and out of
14  either the prison or jail system they are coming
15  to us from or going into.
16      Q.   Okay.  Tell me a little bit about your
17  background.  I believe I saw you were a
18  corrections officer before you started working
19  at PTS.
20      A.   Yes.  How far do you want me to go
21  back?
22      Q.   I guess just tell me a little bit about
23  that.
24      A.   I started working for the Weakley
25  County Jail May of 2011, and I worked there
```

Nolan Roberts
May 14, 2016                                    14

1          MS. BASKAM:  That's fine.  It is still

2   all included within the operations manual based

3   on Page 41, which includes addendums and

4   samples.

5          MR.PARTIN:  Let's go off the record for

6   a second.

7          THE VIDEOGRAPHER:  Going off the

8   record.  The time is 1:54.

9          (Off-the-record discussion.)

10         THE VIDEOGRAPHER:  Going back on the

11  record.  The time is 1:55.

12  BY MS. BASKAM:

13    Q.   Giving back to you what was marked as

14  Plaintiff's Exhibit 2 to Mark Davis's

15  deposition, does that look familiar to you?

16    A.   Yes.

17    Q.   Is that the policies manual?  Were you

18  given this during training?

19    A.   Yes, ma'am.

20    Q.   Okay.  What did that involve in

21  training?

22    A.   My training went pretty quick.  They

23  needed agents to get on the road pretty quick.

24  So we just went through this, hit the high

25  points and then --

1    Q.    Was there any kind of request for you

2  to review it on your own?

3    A.    They said we could.  It wasn't

4  mandatory.

5    Q.    So they just went through highlights of

6  it, and that was the extent that you looked at

7  it?

8    A.    Yes, ma'am.

9    Q.    Okay.  We'll go ahead and go through

10 some things.  You can let me know if you knew

11 about those, if you understood that to be policy

12 that you followed while you were working at PTS.

13   A.    Okay.

14   Q.    First, on the second page you'll see

15 that there is this little signatory page that

16 says you are responsible for reading.  Did you

17 see a page like that?  Did they point anything

18 like that out to you?

19   A.    To be completely honest with you, I

20 really can't remember.

21   Q.    That's fine.  So then moving on, I just

22 want to talk generally about the documentation

23 that you had to have before you got to a

24 prisoner or a detainee to pick up.  Before you

25 ever got to the jail or to wherever you were

Nolan Roberts
May 14, 2016                                          16

1  picking them up, you already had documents about

2  those prisoners.  Is that correct?

3      A.    Sometimes.  We would be given a -- like

4  a face sheet type deal.

5      Q.    That would come from PTS directly?

6      A.    Uh-huh.  It had the information from

7  the place we were picking up, the place we were

8  dropping off and just the offender's name and

9  some brief information about him, height,

10 weight, stuff like that.

11     Q.    Were you supposed to review that before

12 or at any point?

13     A.    We would look -- I took it and I would

14 look over them briefly.

15     Q.    Was that just something you chose to

16 do?

17     A.    Most of the time that packet right

18 there, I would fill out those packets for the

19 people that we were picking up.

20     Q.    So if you are looking at Page 7 --

21          MR. DALY:  Of the document or the Bates

22 numbered pages?

23          MS. BASKAM:  I'm sorry.  You are right.

24 The Bates number page.  Let's go to Page 3.

25 Thank you.

1   BY MS. BASKAM:

2       Q.    You have seen the activity log, that's

3   one of the things you had to have?

4       A.    I don't see it on here.  You said this

5   page?

6           MR. DALY:  (Indicating.)

7       A.    Okay.  Yeah.

8   BY MS. BASKAM:

9       Q.    Down under the third --

10      A.    Yeah.  Yes, ma'am.

11      Q.    You have the activity log.  That would

12  have all this information about who is in

13  charge, the van, that kind of thing?

14      A.    Yes, ma'am.

15      Q.    Then would you have the prisoner

16  packet?

17      A.    Yes, ma'am.

18      Q.    You would know if the prisoner received

19  legal forms, a prisoner status report?

20      A.    Yes, ma'am.

21      Q.    The prisoner status report had medical

22  information in it?

23      A.    To my knowledge, it did.

24      Q.    And so what -- was it part of the

25  policy for you to look at that before you got to

Nolan Roberts
May 14, 2016                                    18

 1    the inmates to check if there is any medical

 2    condition, any concerns?

 3        A.    I'm not sure if it was part of policy,

 4    but I would try to look at that just to kind of

 5    see what we were going to be getting into.

 6        Q.    Okay.  Okay.  If you would turn to Page

 7    14.  You understood that it was your

 8    responsibility to pay attention to things such

 9    as prisoner mood or attitude changes?

10        A.    Yes, ma'am.

11        Q.    Was there a first-aid kit on the van?

12        A.    I can't remember if there was or there

13    wasn't.

14        Q.    Would you remember knowing where a

15    first-aid kit would be on the van if there was

16    one?  Would it be in a typical place?

17        A.    Depending on the OIC of the trip.  I

18    road with three different OIC's for the time I

19    was at PTS, and each OIC kept different stuff in

20    different places.

21        Q.    So for Arnold?

22        A.    I couldn't tell you.

23        Q.    Okay.  How about Page 16, you

24    understood that whoever was driving had to be

25    conscious of their responsibility to the

Nolan Roberts
May 14, 2016                                    19

1   passenger and the prisoners?

2      A.   Yes, ma'am.

3      Q.   Okay.   Then Page 22, you understood

4   that all prisoners had to be restrained with

5   handcuffs and leg irons and interconnects,

6   right?

7      A.   And belly chains.

8      Q.   And so have you personally chained up

9   an inmate, a detainee, before?   That is

10  something you have done, shackled them before?

11     A.   Yes, ma'am.

12     Q.   Tell me a little bit about that.

13  That's a pretty failproof system, right?

14     A.   Not necessarily.

15     Q.   Okay.

16     A.   You would put the -- most of the times

17  I like to put the shackles on first, and then

18  I'll have the offender, whoever I'm cuffing or

19  shackling, face the wall, wrap the belly chain

20  around them and then go ahead and put the cuffs

21  in and then have them slide -- put their wrists

22  in the cuffs and cuff them down.

23     Q.   So at that point they are pretty

24  limited in what they can do, their range of

25  movement?

Nolan Roberts
May 14, 2016                                    20

1     A.   Yes, ma'am.

2     Q.   I want to talk about from Page 26,

3  there is this whole section on special-needs

4  prisoners.  Have you heard that term before?

5     A.   Yes, ma'am.

6     Q.   Did you receive training about special-

7  needs prisoners?

8     A.   If I did, it was brief.

9     Q.   If you did, it was brief.  Okay.  In

10 this, it says "policy," "PTS shall provide the

11 best possible special care that corresponds to

12 the physical problem or physical or mental

13 impairment of the prisoner."  Does that sound

14 correct to you?

15    A.   Yes, ma'am.

16    Q.   So if you get a place and you realize

17 that a prisoner has a special need, then you

18 might do something different for them?  They

19 might have different needs for transport?

20    A.   Depending, yes, ma'am.

21    Q.   So let's go through some of those, what

22 could be special needs to talk about, so that we

23 can talk about it further.  Say if they have,

24 the next page, HIV AIDS or they are a diabetic

25 or they have a broken limb or they've got a

Nolan Roberts
May 14, 2016                                    21

1   nervous disorder, psychosis or they've got

2   medications, do you agree that those are special

3   needs?

4        A.   Yes, ma'am.

5        Q.   Then you also understood that the

6   policy was that in the event that a prisoner

7   develops a medical condition that is life-

8   threatening, that they can be transported to an

9   emergency room immediately; right?

10       A.   Yes, ma'am.

11       Q.   And did you also understand that policy

12  allowed for you to call back to PTS, call to

13  whoever your supervisor was to check about

14  something?

15       A.   Yes, ma'am.

16       Q.   To check what to do in a situation?

17       A.   Yes, ma'am.

18       Q.   So turning to Page 28, you understood

19  policy -- the policy that an inmate must be

20  taken to a hospital if a request is made for

21  medical care.  Is that correct?

22       A.   Yes, ma'am.

23       Q.   There is also under the PTS policies

24  you could -- you must contact dispatch and

25  advise of the condition, right?

1    A.   Yes, ma'am.

2    Q.   And you also must contact the client

3  and get approval for the visit to the hospital?

4    A.   Yes, ma'am.

5    Q.   Okay.  How about Letter H right there,

6  if the agent arrives at pick-up and discovers

7  that a special-needs prisoner is to be

8  transported, the agent should contact

9  headquarters for instructions, did you know that

10  that was --

11    A.   Yes, ma'am.

12    Q.   -- the case?  Did that ever happen for

13  you that you reached a place and saw you thought

14  that they had special needs and you called back

15  to figure out what to do?

16    A.   Yes, ma'am, with the approval of the

17  agent-in-charge.

18    Q.   Got it.  Thank you.  All right.  Then

19  Page 36, which is standards of conduct, the

20  employee of PTS shall refrain from participating

21  in any criminal, dishonest, infamous, immoral or

22  disgraceful conduct or activity.  Is that how

23  you understood the policy to be?

24    A.   Yes, ma'am.

25    Q.   Did you receive any training on CPR?

1  RESPECTIVELY.)

2  BY MS. BASKAM:

3      Q.    Do those look familiar to you,

4  Mr. Roberts?

5      A.    Vaguely, yes.

6      Q.    This is a PowerPoint that we received

7  from PTS.  It is not the complete PowerPoint.

8  It is just a few slides pulled from it.  But I

9  just wanted to call your attention to -- can you

10  go to the second or the third page, if we're

11  counting the first page, where the title says

12  "Civil and Criminal liabilities."

13     A.    Uh-huh.

14     Q.    Were these all things that you were

15  taught in training, prisoners have the right to

16  be free from harassment and discrimination?

17     A.    Yes, ma'am.

18     Q.    Prisoners have the right not to receive

19  cruel and unusual punishment?

20     A.    Yes ma'am.

21     Q.    Prisoners have the right to receive

22  medical care?

23     A.    Yes, ma'am.

24     Q.    Prisoners have the right to be

25  transported in a safe, secure and humane manner?

Nolan Roberts
May 14, 2016                                      26

1     A.   Yes, ma'am.

2     Q.   It is important for PTS agents to know

3  and understand all the policies and procedures

4  and to know and understand and protect the

5  rights of prisoners?

6     A.   Yes, ma'am.

7     Q.   If we can turn to the next page.  What

8  I'm seeing are some steps.  Are these the steps

9  that you understood to be the steps that you

10  should take when you are picking up a prisoner?

11     A.   Yes, ma'am.

12     Q.   Okay.  Including to check medical

13  clearance?

14     A.   Yes, ma'am.

15     Q.   And identify any personality and

16  behavioral traits or problems?

17     A.   Yes, ma'am.

18     Q.   To check both the mental and physical

19  condition of the prisoner?

20     A.   Yes, ma'am.

21     Q.   You are to do this every time you pick

22  someone up?

23     A.   Yes, ma'am.

24     Q.   Okay.  Then this last page, always

25  interview the prisoner in private and do not --

Nolan Roberts
May 14, 2016                                    34

1      A.      Depending on his answer, his or her

2   answer, is where it would go from there.

3      Q.      How about if they were unnaturally

4   pale?  Would that concern you?

5           MR. DALY:  Object to the form.

6      A.      Same answer.  It is all hypothetics.

7   Then again, I would ask them if they were okay.

8   Depending on their answer --

9   BY MS. BASKAM:

10     Q.      But it would spur you to ask if they

11  were okay?

12     A.      Yes, ma'am.

13          MR. DALY:  Object to the form.

14  BY MS. BASKAM:

15     Q.      In your incident report and in your

16  statements to the GBI you said that medical

17  cleared Mr. Weintraub for travel.  Do you

18  remember anything about that?

19     A.      I remember him saying something about

20  him hurting in his stomach area, and Arnold,

21  which was the OIC on the trip, asked, you know,

22  for medical at Owensboro to check him out.  And

23  they cleared him.

24     Q.      Who is "they"?

25     A.      The medical staff there.

Nolan Roberts
May 14, 2016                                    40

1   but you don't remember whether they were a woman

2   or a man, correct?

3        A.    Correct.

4        Q.    And you don't remember what was said

5   between this person and Mr. Arnold, correct?

6        A.    Not everything, no.

7        Q.    What do you remember that was said?

8        A.    Just that Arnold told me that he was

9   cleared and that he was faking and that he --

10  all he wanted was Pepto.  That's what I

11  remember.  That's what stuck in my head.

12       Q.    Do you remember whether Arnold or this

13  person said anything about what their job was?

14       A.    No, not that I can remember.

15       Q.    Nothing was said about if they were a

16  nurse or a doctor?

17       A.    No, ma'am.

18       Q.    Was Pepto given to Dr. Weintraub?

19       A.    Yet again, I don't know.

20       Q.    You did not give Pepto to

21  Dr. Weintraub?

22       A.    No, I did not.

23       Q.    You did not do anything -- did you not

24  provide any aid to Dr. Weintraub?

25       A.    I didn't give him any medication or

Nolan Roberts
May 14, 2016                                    41

1  anything like that.

2      Q.    Or speak it a doctor?

3      A.    Personally, no, I did not.

4      Q.    Okay.  Or you did not call the field --

5  the trip manager or anyone from PTS concerning

6  Dr. Weintraub?

7      A.    It wasn't my place to.

8      Q.    Your place would be to speak with

9  officer-in-charge?

10     A.    Correct.

11     Q.    And you did not bring anything to the

12 attention of the officer-in-charge?

13     A.    He already knew about it.

14     Q.    But you didn't point anything out to

15 him?

16     A.    Not that I can remember, no, ma'am.

17     Q.    Okay.  Do you remember Dr. Weintraub

18 being loaded into the van?

19     A.    No, ma'am.

20     Q.    Okay.  But you did not load him into

21 the van?

22     A.    Not that I can recall.

23     Q.    Do you remember what you were doing

24 when the inmates were loaded into the van?

25     A.    From what I can remember, I was doing

Nolan Roberts
May 14, 2016                              42

1   one of two things:   Either helping the females

2   into the van on the side of the van or getting

3   ready.   Because I was the first one to drive, I

4   would have been either doing that or getting

5   ready -- getting an address put into a GPS and

6   doing that.

7       Q.   Okay.   During this time of Mr. --

8   Dr. Weintraub being loaded into the van or when

9   you first started your journey, do you remember

10  hearing Dr. Weintraub moaning and groaning?

11      A.   While we were in the van?

12      Q.   Yes.

13      A.   No, ma'am.

14      Q.   Do you remember him groaning while he

15  was being loaded or before he was loaded into

16  the van?

17      A.   Very vaguely.

18      Q.   Do you remember mocking him with

19  groaning sounds?

20      A.   Unfortunately, yes, ma'am, I do.

21      Q.   You did this before you got in the van?

22      A.   A little bit before and a little bit

23  after, yes, ma'am.

24      Q.   So he was mocked multiple times by you?

25      A.   By not just me.   All three of us.   Yes,

Nolan Roberts
May 14, 2016                                    43

1   ma'am.

2       Q.    And during this time while you were

3   mocking his groaning, it never occurred to

4   you -- or did it occur to you to check if

5   something was really wrong?

6       A.    At that time we were taking the word of

7   what we were told at Owensboro, which was that

8   there was nothing wrong with him and it was

9   basically a case of jailitis and all he wanted

10  was Pepto.  In my head that's what I was going

11  off of.

12      Q.    Can you fake sweating?

13      A.    I don't see how.

14      Q.    Can you fake becoming pale?

15      A.    I don't see how.

16      Q.    And could you fake becoming

17  jaundiced-colored, yellow in the face?

18      A.    Again, same answer.  I don't see how.

19      Q.    And if the inmates that were in the van

20  with Dr.  Weintraub described him as looking as

21  all of these things, would you dispute that?

22  Would you a disagree with that opinion or

23  description?

24      A.    Sitting here today, I couldn't agree or

25  disagree with it because I don't exactly

1  remember what he looked like then.

2     Q.    But if you saw those things -- well,

3  I'll -- you said in an interview with the GBI

4  that Dr. Weintraub was obviously in distress.  I

5  understand you don't remember any more what he

6  looked like at that time.  But if you said that

7  to the GBI, would you imagine that that was

8  correct, that that was your impression of him?

9     A.    If I said it, I --

10    Q.    If he was obviously in distress, based

11 on the policies that you know for someone with

12 special needs, should you have or should someone

13 from PTS have called either a doctor or maybe

14 your trip manager?

15    A.    Again, we were going off of what we

16 were told at Owensboro.  If -- again, this is

17 hypothetics.  If he would have said something to

18 us, we would have taken the steps that we needed

19 to take.

20         As far as an organization, okay, if he

21 would have said -- say when we stopped for goes

22 right outside of Owensboro or in Owensboro, if

23 he would have said, hey, I'm really hurting, I

24 would have let Arnold know, and I would have let

25 Arnold make that call of what to do.

Nolan Roberts
May 14, 2016                              45

1    Q.   At least one, if not several, of the

2    inmates said that he did have to use the

3    restroom around Chattanooga.  Do you remember

4    that?

5    A.   No, ma'am.

6    Q.   I believe another inmate asked -- or

7    said that they remembered him asking for

8    medication for his stomach, including, like you

9    said, Pepto or Malox.  Do you remember that?

10   A.   No, ma'am.

11   Q.   But you do remember, as you said

12   before, that he asked for Pepto?

13   A.   While we were at the jail, yes.

14   Q.   But you don't remember if he ever got

15   it?

16   A.   No, ma'am, I do not.

17   Q.   So you get in the van at Daviess

18   County.  Then what happens?

19   A.   After we got everybody loaded up, we

20   stopped at the -- one of the gas stations and

21   filled up.  Then we hit the road going towards

22   Blairsville.

23   Q.   When you stopped to get gas, you didn't

24   check on the inmates or detainees or let them

25   out, did you?

1  water for the inmates.  Is that correct?

2      A.    Yes, ma'am.  We stopped to get water

3  and also change out drivers.

4      Q.    During that first leg do you remember

5  Dr. Weintraub asking for the air conditioning to

6  being raised --

7      A.    No, ma'am.

8      Q.    -- or him asking for water?

9      A.    No, ma'am.

10      Q.    Then you got to Chattanooga and you got

11  water.  At this point you don't take the inmates

12  out to use the restroom, correct?

13      A.    No, ma'am.

14      Q.    And so during the entirety of this trip

15  until you got to Union County you don't take the

16  inmates out to use the restroom at all, correct?

17      A.    I know until we got to Chattanooga we

18  didn't.  After we left Chattanooga, I was asleep

19  within five, ten minutes of leaving Chattanooga.

20  Then I didn't wake up until we were at -- in

21  Blairsville, Georgia, and I got woke up to the

22  door coming open and getting hit on the leg and

23  me getting told, hey, you need to get out here.

24      Q.    That was Arnold telling you that?

25      A.    No, that was Mark.

1      Q.    At that point they realized

2   Dr. Weintraub was dead or unresponsive?

3      A.    Yes, ma'am.

4      Q.    Do you remember at any point before

5   that hearing the inmates ask about help for

6   Dr. Weintraub?

7      A.    No, ma'am.  I was asleep.

8      Q.    One of the -- multiple inmates,

9   actually, testified that when Arnold went to

10  take the women into the Union County to use the

11  restroom first, that they were trying to get

12  care for Dr. Weintraub, and that one of the PTS

13  agents said you have to wait until the boss gets

14  here.  Do you remember that?

15     A.    No, ma'am.

16           MR. DALY:  Object to the form.

17           MR. SPAINHOUR:  Objection.

18  BY MS. BASKAM:

19     Q.    So that was not you who said that?

20           MR. DALY:  Same objection.

21     A.    I was asleep at that point.  The first

22  thing I remember from leaving Chattanooga and

23  going to sleep is being woke up to, hey, you

24  needs to get back here and help.  That's it.

25  BY MS. BASKAM:

1    County and gets out of the van and starts taking

2    these women inside, is it normal that he would

3    not wake you up before doing that?

4        A.    Being at a jail, yes, that is normal.

5        Q.    So would you just still be sleeping in

6    this van not awares of what is happening?

7        A.    Correct.  You are in a space where you

8    are at a jail, you are in a secured area.  So, I

9    mean --

10           MS. BASKAM:  Can we go off record a

11    second.

12           THE VIDEOGRAPHER:  Going off the

13    record.  The time is 2:40.

14           (Brief recess.)

15           THE VIDEOGRAPHER:  Going back on the

16    record.  The time is 2:41.

17   BY MS. BASKAM:

18        Q.    Just a few other questions about the

19    statement you made to the GBI.  Do you remember

20    having two conversations with Ken Baker maybe?

21        A.    No.

22        Q.    Just with the GBI about what happened?

23        A.    I had three conversations with them

24    from what I can remember.

25        Q.    So in the first one -- but all three

Nolan Roberts
May 14, 2016                                    53

```
 1      A.    In the world of corrections and

 2  transporting inmates and stuff like that,

 3  inmates have rules that the facility's

 4  corrections officers have to enforce and follow.

 5  Inmates, on the other hand, have their own set

 6  of rules, too.  I know a lot of times they do

 7  govern themselves.

 8      Q.    I'm going to move to strike this as

 9  unresponsive.

10            Did you tell an inmate that they should

11  govern themselves on this trip?

12      A.    Yes, ma'am, I did.

13      Q.    Do you recall inmates and -- well, do

14  you recall inmates telling Dr. Weintraub to be

15  quiet?

16      A.    Vaguely, yes, ma'am.

17      Q.    Do you recall PTS agents telling

18  Weintraub to be quiet?

19      A.    After we were told, you know, that

20  there is nothing wrong with him, that he was

21  faking it, vaguely I remember somebody saying,

22  you know, we're told -- or there is nothing

23  wrong with you, you know, quit.

24      Q.    So did you tell Dr. Weintraub or did a

25  PTS agent tell Dr. Weintraub to be quiet?  Yes
```

Nolan Roberts
May 14, 2016                                54

1   or no?

2      A.   It might have been said.  I don't know

3   who said it.  I can't remember.

4      Q.   Do you know whether it was said

5   regardless of who was the one who said it?

6      A.   I can't remember.  I'm being honest

7   with you.  I can't remember if it was said or

8   not.

9      Q.   Okay.  When you were mocking

10  Dr. Weintraub, you were making groaning noises?

11     A.   Yes, ma'am.

12     Q.   And you knew you were doing that at the

13  time that you made those noises?

14     A.   I know I was doing that.

15     Q.   Yes.

16     A.   Yes, ma'am, I do.

17     Q.   It wasn't some involuntary reaction?

18     A.   No, ma'am.  I was well aware of what I

19  was doing.

20     Q.   Why did you do it?

21     A.   I can't tell you why.  I mean, it was a

22  mistake.  I knew as to why we were doing it, I

23  mean, but I couldn't give you an exact reason

24  why.

25     Q.   At the time when you stopped in

Nolan Roberts
May 14, 2016
69

1   Arnold just said he is cleared for transport?

2   That's what you just testified to.

3        A.    I said a few minutes ago also that I

4   saw him talking to the medical staff at Daviess

5   County.

6        Q.    That's right.  You don't have any idea

7   what medical actually told Arnold?

8        A.    I guess I don't.

9        Q.    But you just assumed that Mr. Weintraub

10  was cleared for transport because that's what

11  you were told by Arnold?

12       A.    I guess in your words, yes, sir.

13       Q.    Now, you didn't look at any of

14  Mr. Weintraub's medical paperwork, did you?

15       A.    Not that I can recall.

16       Q.    But medical paperwork is part of the

17  prisoner packet?

18       A.    Yes, sir.

19       Q.    And part of the prisoner packet would

20  be a medical authorization for transport?

21       A.    I would assume so, yes, sir.

22       Q.    Have you ever seen a medical packet

23  that included a medical authorization for

24  transport?

25       A.    That top paper right there is the only

Nolan Roberts
May 14, 2016

72

1      A.     As far as I know, no, sir.

2      Q.     You know that Mr. Weintraub was housed

3   at Daviess County Jail for awhile, right?

4      A.     Yes, sir.

5      Q.     And so there wouldn't be a separate

6   medical authorization for transport from Daviess

7   County Jail?

8      A.     No, sir.

9      Q.     When agent Arnold told you that

10  Mr. Weintraub was cleared for transport, did you

11  say to him, hey, you know, we need to get a

12  medical authorization from Daviess County Jail

13  to clear him?

14     A.     It wasn't my place to.

15     Q.     Why wasn't it your place?

16     A.     Because I wasn't the officer-in-charge.

17     Q.     Is it your testimony, then, that only

18  the officer-in-charge has the responsibility for

19  ensuring the medical safety of inmates?

20     A.     No, sir.

21     Q.     I mean you have some responsibility,

22  right?

23     A.     Yes, sir, I do.

24     Q.     You didn't say anything to Agent Arnold

25  about getting an authorization, medical

Nolan Roberts
May 14, 2016                                    73

1    authorization, for Mr. Weintraub from Daviess

2    County Jail?

3        A.    No, sir, I did not.

4        Q.    The PTS policies require you as an

5    agent to get an inmate medical care if you

6    believe they need it?

7        A.    Yes, sir.

8        Q.    And you didn't make any attempt to get

9    Mr. Weintraub medical care?

10       A.    When I guess in your words I was going

11   off of what Arnold told me and, like I said,

12   like I testified to earlier, once we left

13   Daviess County, I didn't hear anything out of

14   Mr. Weintraub.

15       Q.    But while at the Daviess County Jail

16   you didn't see anything from Weintraub that told

17   you, hey, we need to get him medical attention?

18       A.    I know while we were at Daviess County

19   Agent Arnold asked for the medical staff from

20   Daviess County to come check him out, and they

21   come out there, and as far as they checked him

22   out, what they did to check him out, I'm unsure

23   of that, but I know they did come out there, and

24   I saw them talk to Arnold.  I mean, I can't

25   remember if they actually took him back into the

Nolan Roberts
May 14, 2016                              74

1   jail and gave him a once-over.  I can't remember

2   what all they did with Mr. Weintraub per se.

3   But, I mean, I did see they did come out there.

4        Q.    So you saw medical come out to the

5   holding area before Mr. Weintraub was

6   transported from Daviess County Detention

7   Center?

8        A.    Before we left with him, yes, sir, I

9   did.

10       Q.    Did you see Mr. Weintraub disappear

11  into medical after he came out of holding?

12       A.    I can't recall.

13       Q.    Do you know why Agent Arnold asked for

14  medical to come out and check out Mr. Weintraub?

15       A.    Because he had said that he was in

16  pain.

17       Q.    Did you and Agent Arnold have a

18  discussion about why Agent Arnold wanted to have

19  medical staff come out and check out

20  Mr. Weintraub?

21       A.    Not that I can recall.

22       Q.    How do you know that the reason why

23  Agent Arnold wanted medical to come out and

24  check out Mr. Weintraub was because

25  Mr. Weintraub was in pain?

Nolan Roberts
May 14, 2016                                             76

1   person that came out to medical?

2       A.   As I stated the last three questions

3   you asked, no, sir, I haven't.  No, sir, I

4   cannot.

5       Q.   Do you remember what that person was

6   wearing?

7       A.   I mean I know they were wearing scrubs.

8       Q.   How do you know they were wearing

9   scrubs?

10      A.   I mean I can -- I mean -- I mean I can

11  remember that part.

12      Q.   You can remember that they were wearing

13  scrubs?

14      A.   Yes, sir.

15      Q.   You just can't remember anything else

16  about the individual?

17      A.   Correct.

18      Q.   What color scrubs?

19      A.   I can't remember.

20      Q.   How do you know the person was wearing

21  scrubs?

22      A.   That's just what sticks in my head.

23      Q.   Did you see the person who came out --

24  that you believe came out from medical touch

25  Mr. Weintraub in any way.

Nolan Roberts
May 14, 2016                                         77

1     A.    No, sir, I did not.

2     Q.    Did you see the person that you believe

3  came out from medical give Mr. Weintraub

4  anything?

5     A.    No, sir, I did not.

6     Q.    Did you see Mr. Weintraub at any time

7  take any medication?

8     A.    No, sir, I did not.

9     Q.    Did at any time anybody mention giving

10 Mr. Weintraub Tylenol?

11    A.    Not that I can remember.

12    Q.    Did anybody at any time ever mention

13 Mr. Weintraub having been given Tylenol?

14    A.    Not that I can remember.

15    Q.    Do you remember any conversations with

16 any of the staff at the Daviess County Jail

17 other than the one correctional officer that you

18 testified to earlier?

19    A.    As far as conversation goes, I can't

20 remember what exactly we talked about.

21    Q.    Do you remember anybody at Daviess

22 County Detention Center calling Mr. Weintraub a

23 pussy?

24    A.    No, sir.

25    Q.    Do you remember anybody at Daviess

Nolan Roberts
May 14, 2016                                    78

```
 1    County Jail ever mocking Mr. Weintraub other
 2    than you and your fellow agents?
 3       A.    Not that I can remember.
 4       Q.    How many times did you pick up
 5    prisoners at the Daviess County Detention
 6    Center?
 7       A.    Four, five, six times, if I can
 8    remember correct.   Four or five, six times,
 9    somewhere in there.
10       Q.    During those four or five, six times,
11    do you ever remember anybody at Daviess County
12    Detention Center mocking or making fun of
13    inmates?
14       A.    Not that I can remember, no, sir.
15       Q.    The officer-in-charge would have been
16    responsible for reviewing Mr. Weintraub's inmate
17    package?
18       A.    The agent-in-charge for PTS?
19       Q.    Yes.
20       A.    Yes, sir.
21       Q.    And so it would have been Arnold that
22    would have reviewed Mr. Weintraub's prisoner
23    transport package?
24       A.    Yes, sir.
25       Q.    So it would have been Officer Arnold
```