# EXHIBIT C

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF GEORGIA

3               ATLANTA DIVISION

4    _____

5

6    ROBERT WEINTRAUB, et al,

7          Plaintiffs,

8    VS.                          NO. 1:15-cv-01213AT

9

10   ADVANCED CORRECTIONAL
     HEALTHCARE, et al,

11

12         Defendants.

13   _____

14                  DEPOSITION

15                     OF

16                 MARK DAVIS

17          Saturday May 14th, 2016

18

19

20

21

22

23

24

25

Mark Davis
May 14, 2016                                      8

```
 1  largest?

 2     A.   They are.  As of now they are the

 3  largest.  They were the second.

 4     Q.   Okay.  So PTS is paid to safely

 5  transport prisoners from one detention center in

 6  one state to another detention center in another

 7  state?

 8     A.   Yes.

 9     Q.   Okay.  And they are paid to do that

10  safely?

11     A.   Yes.

12     Q.   Okay.  I'm going to show you what we've

13  marked as Exhibit 1, which is a page from PTS's

14  website.  Have you had an occasion to see PTS's

15  website before?

16     A.   I have.

17          (WHEREUPON, THE ABOVE-MENTIONED

18  DOCUMENT WAS MARKED AS EXHIBIT 1.)

19  BY MR. PARTIN:

20     Q.   Okay.  Do you agree with the statements

21  that it makes on its website when it says it

22  provides unparalleled service for prisoner

23  transportation needs?

24     A.   I do.

25     Q.   And that its core focus is safety?
```

Mark Davis
May 14, 2016                                    9

```
 1    A.   Yes.
 2         MR. DALY:  Is that on this exhibit?
 3         MR. PARTIN:  Yes.
 4         MR. DALY:  Where is it?
 5         THE WITNESS:  (Indicating.)
 6         MR. DALY:  Sorry.
 7  BY MR. PARTIN:
 8    Q.   Under "Safety" it says "We go the extra
 9  mile to insure staff and detainee safety every
10  step of the way."  Do you see that?
11    A.   Yes.
12    Q.   You are no longer employed by PTS,
13  correct?
14    A.   I am not, no.
15    Q.   When did you cease being employed by
16  them?
17    A.   As far as a date, I can't remember.  It
18  was sixteen months after my initial hire date.
19    Q.   Okay.  When you were hired by PTS, what
20  was your title?
21    A.   Senior agent.
22    Q.   What does a senior agent do for PTS?
23    A.   Everything it entails as far as
24  contacts facilities to arrange the pickup or
25  drop-off of an inmate, housing in the case we
```

Mark Davis
May 14, 2016                                        12

1    want it from them, you have to give it to them,

2    that kind of thing.

3       Q.    Okay.  Did you receive a copy of the

4    policies and procedures manuals which we've

5    marked as Exhibit 2?

6       A.    I did.

7             (WHEREUPON, THE ABOVE-MENTIONED

8    DOCUMENT WAS MARKED AS EXHIBIT 2.)

9    BY MR. PARTIN:

10      Q.    Did you have a chance to review that

11   when you were in training before you were

12   assigned to this transport?

13      A.    Yes.

14      Q.    Okay.  You were familiar with these

15   policies and procedures at the time of this

16   transport?

17      A.    I was.

18      Q.    So on Page 12 you were familiar with

19   the fact that it says prisoners should be

20   treated fairly, humanely and with dignity?

21      A.    Yes.

22      Q.    On Page 13 you were familiar with the

23   policy that agents will maintain constant

24   awareness of prisoner contact, behavior,

25   attitude and moods?

Mark Davis
May 14, 2016                                    13

 1      A.    Yes.

 2      Q.    Okay.   Then on Page 27 you were also

 3   aware of the policy that, quote, Under E, in the

 4   event that a prisoner develops a medical

 5   condition that is life-threatening or sustains a

 6   life-threatening injury that constitutes an

 7   injury, that the agent may transport the

 8   prisoner to an emergency room immediately?

 9      A.    Correct.

10      Q.    Okay.   How you were trained on these

11   policies and procedures?  Were they just given

12   to you and you were told to read them?  Were you

13   tested on them?

14      A.    No, none of that.  We were just given

15   kind of as ideas, you go over it by yourself.

16      Q.    But you knew they existed?

17      A.    Yes.

18      Q.    And you had been told to be familiar

19   with them?

20      A.    Uh-huh.

21      Q.    Now, in your role senior agent, you

22   didn't have any duties in terms of providing

23   medical care yourself, did you?

24      A.    No.

25      Q.    You didn't have any training for

Mark Davis
May 14, 2016                                    24

1   in custody for ten days.

2       Q.   Okay.  Do you know when he was picked

3   up initially from Colorado?

4       A.   No.

5       Q.   Were you aware when you picked him up

6   that he had Graves Disease and a thyroid

7   condition?

8       A.   I did not.

9       Q.   Were you aware that it is reflected in

10  his paperwork and medical records?

11      A.   No, I did not.  I mean, I did go

12  through his paperwork.

13      Q.   Okay.  In your training were you also

14  trained on how to deal with prisoners with

15  special needs and medical conditions?

16      A.   Yes.

17      Q.   Okay.  In fact, the policy at Page 26

18  says that PTS shall provide the best possible

19  special care that corresponds to the particular

20  problem with the physical and mental impairment

21  of the prisoner?

22      A.   Uh-huh.

23      Q.   Do you agree with that?

24      A.   I do.

25      Q.   Do you recall being interviewed by the

Mark Davis
May 14, 2016                                    27

1   the nurse, right?

2       A.   Up, right.

3       Q.   You didn't see a team of people to

4   evaluate him?

5       A.   No, I did not there.  They may have

6   been in the medical room, but it was unbeknownst

7   to me.

8       Q.   Now, did somebody tell you specifically

9   that he was medically cleared for transport?

10      A.   No.  She told Arnold, and I overheard.

11      Q.   You overheard?

12      A.   Uh-huh.

13      Q.   So you were standing there physically

14  present with your own ears and you heard her say

15  to Mr. Arnold what?

16      A.   That he was medically cleared to

17  travel, that he was faking it.

18      Q.   Okay.  He was faking what?

19      A.   His moans and groans and whatever he

20  had going on.

21      Q.   Did you tell the GBI that he was

22  sweating profusely?

23      A.   I did.  He was sweating bullets.

24      Q.   Sweating bullets.  Was he also cold,

25  clammy and pale?

Mark Davis
May 14, 2016                                    28

1      A.    He was pale then.

2      Q.    Can you fake sweating bullets?

3      A.    No, you can't.

4      Q.    Can you faking cold, clammy and pale?

5      A.    No.

6      Q.    Did you believe that he was faking it?

7      A.    I don't know.  I mean, you see sick

8   people all the time.  You yourself could get

9   sick.  It is just symptoms.  You never know what

10  they could be.  So I don't know.

11     Q.    My question was did you believe that he

12  was faking being sick?

13     A.    I believed it, yeah.

14     Q.    You believed he was faking by

15  intentionally sweating and intentionally making

16  himself pale?

17     A.    I don't know  how you can intentionally

18  sweat, but I believe he was, yeah.

19     Q.    So it is your testimony to this jury

20  that you believe he was faking being sick by

21  somehow making himself sweat bullets?

22     A.    Yeah.

23     Q.    And somehow making himself appear pale

24  and cold and clammy?

25     A.    Yeah.

Mark Davis
May 14, 2016                                    29

```
 1      Q.    He is one heck of an actor, isn't he?

 2      A.    I guess.

 3            MR. DALY:  Object insofar as he didn't

 4   testify that he was cold and clammy.

 5            MR. SPAINHOUR:  I join in the

 6   objection.

 7   BY MR. PARTIN:

 8      Q.    I think Mr. Russ testified that he was

 9   colds, clammy and pale.  Would you disagree with

10   that?

11      A.    Who is Mr. Russ?

12      Q.    A medical technician that was at the

13   detention center.

14      A.    Well, that wasn't told to me, so --

15      Q.    But you yourself told the GBI he was

16   sweating profusely, and you just said he was

17   sweating bullets, right?

18      A.    Uh-huh.

19      Q.    He was moaning and groaning.  You told

20   the GBI he was slumped over.  Do you agree with

21   that?

22      A.    He was kind of -- yeah, he was a big

23   guy.  He was hunched a little bit.

24      Q.    He was a big guy, but you noticed that

25   his pants were hanging off of him, they were
```

Mark Davis
May 14, 2016                                          30

1   kind of dropping off of him?

2       A.    Yeah.

3       Q.    Were you aware he had lost almost forty

4   pounds in the ten dates he had been -- since PTS

5   picked him up?

6       A.    No, I did not.

7       Q.    Did you think he was in condition to be

8   transported across the country?

9       A.    Yeah.

10            MR. DALY:   Object to the form.

11  BY MR. PARTIN:

12      Q.    Would it surprise you if the nurses

13  that worked for ACH testified that they did not

14  medically clear him for transportation?

15      A.    That's surprising.

16      Q.    What did the nurse look like that you

17  overheard say he was medically cleared?

18      A.    The only thing that I can remember was

19  dirty blonde hair, that's all.

20      Q.    Dirty blonde hair?

21      A.    Uh-huh.

22      Q.    You mean highlighted?

23      A.    No, like a natural dirty blonde hair,

24  like mine.

25      Q.    Was she bigger than you or smaller than

1  brought Mr. Weintraub out and you were the one

2  that asked them to re-evalute him?

3     A.   I told my officer-in-command that that

4  is what needs to happen.  He's the one that told

5  them.

6     Q.   He agreed with you that he needed to be

7  re-evaluated?

8     A.   Uh-huh.  All three of us did.

9     Q.   Okay.  Are you aware of any documents

10 that show that he was re-evaluated?

11    A.   No.

12    Q.   Are you aware of any documents that

13 show he was medically cleared?

14    A.   No.

15    Q.   Did anybody call -- anybody from PTS

16 call a supervisor and say we've got a situation

17 here, we've got a guy who is sweating bullets,

18 slumped over, moaning, groaning, complaining of

19 pain, but they are trying to send him on?

20    A.   I  can't remember.

21    Q.   You are not aware of anybody doing

22 that?

23    A.   No.

24    Q.   Okay.

25    A.   I don't know.

Mark Davis
May 14, 2016                                    33

1    Q.    All right.  So you all put him in the
2  van?
3    A.    Uh-huh.
4    Q.    He had to be helped into the van,
5  didn't he?
6    A.    Yeah.
7    Q.    He is a big dude?  He was six nine,
8  wasn't he?
9    A.    Well, I didn't know he was six nine.
10  At the time I just looked taller than him.
11    Q.    Okay.
12    A.    Yeah, he had to have some assistance.
13  We help everybody into the van.  You don't want
14  them to fall.
15    Q.    Didn't his pants almost fall off of him
16  when he was getting in the van?
17    A.    Yeah, yeah.
18    Q.    What happens next?
19    A.    We shut the cage, lock it, shut the
20  back doors, and proceed on with our trip.
21    Q.    Okay.  How far did you go before you
22  stopped?
23    A.    I'm not sure.  I was only awake for
24  another twenty, thirty minutes.  I assume when
25  they stopped for water or whatever, I was

1  asleep.  I was out for the entire trip other

2  than that twenty or thirty minutes after we left

3  Owensboro.

4      Q.   Okay.  Didn't you tell the GBI that

5  when you were back at the prison in Kentucky

6  that it was a man that you had talked to that

7  said he was okay to go?

8      A.   I don't recall.  I remember a woman.

9      Q.   Were you aware of your conversation

10  with the GBI was recorded?

11      A.   Uh-huh.

12      Q.   And would you disagree with that

13  recording or transcript of the recording if it

14  says "a guy was coming in and out of the medical

15  room and I had a conversation with him"?

16      A.   No.

17      Q.   So why would you say it was a guy that

18  medically cleared him or was coming in and out

19  of the room to the GBI and today you said it was

20  a woman?

21      A.   I remember a woman.  If I said it was a

22  guy then, then that was then.  That was a little

23  over two years ago.  It is hard to remember that

24  stuff.

25      Q.   But the statement you give to the GBI

Mark Davis
May 14, 2016                                    36

1     Q.    Okay.  Were you all playing music as

2  you are driving?

3     A.    For that first twenty or thirty minutes

4  that I was awake, we were, yeah.

5     Q.    Okay.  But could you still hear

6  Mr. Weintraub moaning and groaning?

7     A.    No.  I mean, if someone were to tell us

8  that he was, I mean, that's a different story,

9  but he was in the very, very back of the van.

10  So if he didn't speak up or anything to anybody

11  else, we would have never known.

12     Q.    Did you ever hear moaning again in the

13  van while you were driving?

14     A.    Ug-huh.  Like I said, I was asleep.

15     Q.    All right.  What is the next thing you

16  remember?

17     A.    Arnold had came out of the jail after

18  taking the females in to use the restroom, and

19  he went back to the back of the van to take the

20  males in, and after he noticed Mr. Weintraub was

21  gone, he came and opened my door, woke me up,

22  and then he opened the door where the bed is and

23  woke Roberts up and we got out.  That was the

24  next time I was coherent.

25     Q.    So about what time was it when you all

1   left the detention center in Kentucky?

2       A.   I can't remember.

3       Q.   If the records say it was about nine

4   forty-five p.m., would you disagree with that?

5       A.   No, I wouldn't.  That's pretty

6   accurate, I guess.

7       Q.   And how long of a drive was it to North

8   Georgia from Kentucky?

9       A.   I can't recall.  Eight, nine hours.

10      Q.   Okay.  So is it your testimony that you

11  were asleep other than the first twenty minutes

12  for eight or nine hours?

13      A.   It is.

14      Q.   Okay.  You were in the sleeping berth?

15      A.   No.  I was in the passenger seat.

16      Q.   So you were sitting upright in the

17  passenger seat asleep for eight or nine hours?

18      A.   Uh-huh.

19      Q.   You never woke up when the truck

20  stopped for gas, never woke up when the truck

21  stopped for water, never woke up when the doors

22  were open to give the prisoners water?

23      A.   No.  I was knocked out.

24      Q.   Okay.  Did you take any sleeping

25  medication?

Mark Davis
May 14, 2016                             43

1      A.    Yeah.   I'm not going to deny that.

2      Q.    So you didn't tell him that the first

3  time?

4      A.    No.

5      Q.    Why did you not tell him that you were

6  mocking him when he first interviewed you about

7  what had been going on?

8      A.    I mean any person can say that.   That

9  just doesn't look good.   I don't know.   I didn't

10  want the guy to die.   I mean, you don't want

11  anybody to die.

12      Q.    When you say you were mocking him, what

13  do you mean by that?

14      A.    Making the same kind of groan noises

15  that he was making.   That's pretty much it.

16      Q.    At what point in time were you doing

17  that?

18      A.    It was at the jail in Owensboro.   I

19  don't remember if it was blatantly right there

20  in front of him or if it was when he went back

21  to get examined again.   I don't know.

22      Q.    If the other witnesses testified it was

23  occurring in front of him, would you disagree

24  with that?

25      A.    No, I wouldn't.

Mark Davis
May 14, 2016                               44

1      Q.    Okay.  Why were you doing that?

2      A.    I don't know.  First day on the job.  I

3   mean, I know that inmates all the time they ask

4   for stuff, they fake stuff just to get what they

5   want.  I don't know.  It was the first day on

6   the job.  I guess I wanted to be cool, which is

7   not.

8      Q.    You knew it was wrong, didn't you?

9      A.    Oh, yes, I did, yeah.

10     Q.    I know you may regret it now, but you

11   knew it was wrong at the time you did it, didn't

12   you?

13     A.    Yeah.

14     Q.    That's why you didn't tell the GBI

15   about it?

16     A.    Yeah.

17     Q.    You did it on purpose, right?

18     A.    Uh-huh.

19     Q.    These weren't involuntary utterances

20   you were making?

21     A.    No.

22     Q.    Do you think that would have made

23   Mr. Weintraub feel better?

24     A.    No, not at all.

25     Q.    It would probably make him feel worse,

Mark Davis
May 14, 2016                              45

1  wouldn't it?

2      A.    Yeah.

3      Q.    You knew that when you did it?

4      A.    I assume so.

5      Q.    If you are lying there dying of a

6  perforated ulcer moaning and groaning and

7  sweating profusely and somebody is mocking you,

8  you knew that would make you feel worse, didn't

9  you?

10      A.    Yeah, it would.

11      Q.    Do you regret mocking him now?

12      A.    Oh, absolutely.  Who wouldn't?

13            MR. PARTIN:  Let's take a short break.

14            THE VIDEOGRAPHER:  Going off the

15  record.  The time is 12:30.

16            (Brief recess.)

17            THE VIDEOGRAPHER:  Going back on the

18  records.  The time is 12:48.

19  BY MR. PARTIN:

20      Q.    Mr. Davis, some of the other

21  witnesses, other prisoners in the transport van,

22  said that they told the crew that Mr. Weintraub

23  needed medical care at some point during the

24  transportation.  Do you recall that?

25      A.    Ug-huh.

1    A.    I think I did.

2    Q.    You think I did?

3    A.    Uh-huh.

4    Q.    Do you think you treated Mr. Weintraub

5  fairly and humanely and with dignity?

6    A.    I mean other than mocking him.

7    Q.    So didn't comply with the policy when

8  you were mocking him, correct?

9    A.    Right.

10    Q.    Do you think you maintained constant

11  awareness of Mr. Weintraub's behavior and

12  attitude and moods?

13    A.    Uh-huh.

14    Q.    How did you do that when you were

15  asleep the whole time?

16    A.    Well, I mean, I can do that when I'm

17  awake at Owensboro.

18    Q.    How were you getting trained and

19  receiving training on this trip if you slept the

20  whole time?

21    A.    What kind of training can you get when

22  you are sitting there and another person is

23  driving for eight hours?

24    Q.    Well, is that PTS's policy or procedure

25  that if one person is driving, the other person

Mark Davis
May 14, 2016                                                    52

1    5, this medical authorization for transport.  Is

2    that what you were talking about?

3       A.    I'm assuming.  If that is -- that is

4    given at the very beginning of a transport for

5    anybody, and obviously there is no alteration on

6    that saying that he had been looked over.  So

7    I'm going to say that that is probably something

8    that I was told from my officer-in-command.

9       Q.    So you are not aware of any other

10   paperwork that, quote, unquote, medically

11   cleared him other than Exhibit 5?

12      A.    No.

13      Q.    And as we discussed earlier, Exhibit 5

14   was dated about ten days before you picked him

15   up?

16      A.    Uh-huh.

17      Q.    The second thing that sounded a little

18   different in your statement to the GBI was that

19   you were awake when you all stopped at the gas

20   station because you ate food, ate a hot dog, and

21   I'm pretty sure you didn't eat the hot dog while

22   you were sleeping.

23      A.    Right.

24      Q.    Is it correct, then, that you must have

25   been awake when you all stopped at the gas

Mark Davis
May 14, 2016                              57

1      A.    Uh-huh.

2      Q.    So is your testimony that you gave

3   earlier, is that incorrect?

4           MR. DALY:  Object to the form.

5      A.    I was standing there.  I still believe

6   I heard somebody say that he was released for

7   travel.

8   BY MR. PARTIN:

9      Q.    Okay.

10      A.    It may be that correctional officer or

11   a nurse.

12      Q.    But you didn't tell the GBI that when

13   you were asked specifically what you recalled

14   about medical clearance and when you picked him

15   up?

16      A.    No.

17           MR. PARTIN:  Now I don't have any

18   further questions.

19           MR. DALY:  Kevin?

20                EXAMINATION

21   BY MR. SPAINHOUR:

22      Q.    Mr. Davis, my name is Kevin Spainhour,

23   I represent Advanced Correctional Health.

24           If I understand your testimony, you are

25   the eight that shackled Mr. Weintraub --

Mark Davis
May 14, 2016                                         58

1      A.    Uh-huh.

2      Q.    -- is that correct?

3      A.    Uh-huh.

4      Q.    Do you remember what Mr. Weintraub was

5   wearing when you shackled him?

6      A.    Blue jeans.  I don't know what kind of

7   shirt.  It looked like he had a sweat shirt over

8   a T-shirt maybe.  And some shoes that didn't

9   look like his size.

10     Q.    Do you remember whether you ever --

11  while you were shackling Mr. Weintraub whether

12  you ever touched his skin in any way?

13     A.    No.  I can't recall if he had any socks

14  on or not.  Generally I don't put the shackles

15  on on their bare-skin ankles.  I don't want to

16  rub them raw.  I wouldn't for myself.  So I

17  believe it was he wore jeans.

18     Q.    What about the cuffs, how would you

19  have cuffed Mr. Weintraub?

20     A.    I mean they have their hands like this

21  before us.  (Indicating.)  I would assume I would

22  have touched his hand, but I don't remember what

23  he would have felt like.

24     Q.    You don't remember him being cold and

25  clammy when you touched his hands to put the

Mark Davis
May 14, 2016                                    60

1      Q.    Now, as part of your duties with PTS

2  transporting inmates you do transport inmates

3  with medical conditions, correct?

4      A.    Correct.

5      Q.    Okay.  If you have an inmate that has a

6  medical condition that you are concerned about,

7  one of the things that the PTS policies require

8  you to do is to advise dispatch.  Is that fair?

9      A.    Yeah.

10     Q.    Did you or your officer-in-charge or

11 Mr. Roberts notify dispatch that you had an

12 inmate with a medical condition?

13     A.    I don't remember.

14     Q.    If you or your officer-in-charge or

15 Mr. Roberts did notify dispatch that you had an

16 inmate with a medical condition, would that be

17 recorded somewhere?

18     A.    I'm not sure.

19     Q.    You don't know what happens with that

20 information when you do give it to dispatch?

21     A.    I don't know if it is audio-recorded or

22 not.  I don't know if there is anything Like

23 that.

24     Q.    Do you know how you go about notifying

25 dispatch that you have an inmate with a medical