# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| ROBERT WEINTRAUB, as Natural Parent and Surviving Heir of WILLIAM WEINTRAUB, deceased, and as Administrator of the ESTATE OF WILLIAM WEINTRAUB, | ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| ADVANCED CORRECTIONAL HEALTHCARE, INC. a foreign corporation, and PTS of AMERICA, LLC, a foreign limited liability corporation, | ) ) ) ) ) |
| Defendants. | ) |

Civil Action

File No. 1:15-cv-01213-AT

## PLAINTIFFS' RESPONSE TO DEFENDANT PTS OF AMERICA, LLC'S STATEMENT OF UNDISPUTED FACTS

COMES NOW Plaintiff Robert Weintraub, both individually as natural parent and surviving heir of William Weintraub, and as Administrator of the Estate of William Weintraub, and pursuant to Local Rule 56.1(B)(2)(a) and Section III(g) of Judge Totenberg's Standing Order, submits his response to Defendant PTS of America, LLC's Statement of Undisputed Material Facts, showing that numerous facts are actually in dispute and therefore present a genuine issue for trial, making summary judgment inappropriate here.

1

1.      On October 11, 2013, the decedent was charged with threatening or attempting to use a weapon of mass destruction in furtherance of an act of terrorism in and around Conway, South Carolina, pursuant to Section 16-23-715 of the South Carolina Code. (See Arrest Warrant [PTS000667-672], attached to brief as Exhibit A.)

**RESPONSE**:  Plaintiffs object to this fact on the grounds that it is not material to this case. See NDGA Local Rule 56.1(B)(1) and (B)(2)(a)(2)(iii); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (the Supreme Court defining "material facts" as those facts "that might affect the outcome of the suit under the governing law"). The reason that Dr. Weintraub was in custody, having never been convicted, is irrelevant to PTS's denial of medical care.


2.      A Horry County magistrate judge issued a warrant for the decedent's arrest based on an affidavit submitted by a Horry County police officer. (See Arrest Warrant [PTS000667-672], attached to brief as Exhibit A.)

**RESPONSE**:  Plaintiffs object to this fact on the grounds that it is not material to this case. See NDGA Local Rule 56.1(B)(1) and (B)(2)(a)(2)(iii); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (the

Supreme Court defining "material facts" as those facts "that might affect the outcome of the suit under the governing law"). The reason that Dr. Weintraub was in custody, having never been convicted, is irrelevant to PTS's denial of medical care.

3.     The affidavit explained that on October 9, 2013, the decedent left voice-mail messages and sent e-mail messages to a local newspaper office saying that he intended to carry out threats he had made in the past regarding incidents for which he believed he was wrongly accused. (See Arrest Warrant [PTS000667-672], attached to brief as Exhibit A.)

**RESPONSE**:  Plaintiffs object to this fact on the grounds that it is not material to this case. See NDGA Local Rule 56.1(B)(1) and (B)(2)(a)(2)(iii); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (the Supreme Court defining "material facts" as those facts "that might affect the outcome of the suit under the governing law"). The reason that Dr. Weintraub was in custody, having never been convicted, is irrelevant to PTS's denial of medical care.

4.     Between 2007 and 2012, the decedent was reported for and charged with

making multiple threats to cause massacres, blow up schools, and kill public officials. (See Arrest Warrant [PTS000667-672], attached to brief as Exhibit A.)

**RESPONSE**:  Plaintiffs object to this fact on the grounds that it is not material to this case. See NDGA Local Rule 56.1(B)(1) and (B)(2)(a)(2)(iii); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (the Supreme Court defining "material facts" as those facts "that might affect the outcome of the suit under the governing law"). The reason that Dr. Weintraub was in custody, having never been convicted, is irrelevant to PTS's denial of medical care.

5.     In early February 2014, the Horry County prosecutor learned that the decedent had been arrested and incarcerated in Boulder County, Colorado, so he asked the Governor of South Carolina to issue an extradition request to the Governor of Colorado for the decedent to be returned to Horry County. (See Application for Extradition Requisition [PTS000664-666], attached to brief as Exhibit B.)

**RESPONSE**:  Plaintiffs object to this fact on the grounds that it is not material to this case. See NDGA Local Rule 56.1(B)(1) and (B)(2)(a)(2)(iii); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (the

Supreme Court defining "material facts" as those facts "that might affect the outcome of the suit under the governing law"). The reason that Dr. Weintraub was in custody, having never been convicted, is irrelevant to PTS's denial of medical care.

6.     The Governor of South Carolina issued the extradition request on February 19, 2014. (See Requisition and Agent Commission signed by Governor Nikki Haley [PTS000663], attached to brief as Exhibit C.)

**RESPONSE**:  Not disputed.

7.     The Governor of Colorado granted the request on March 14, 2014, thereby designating the Horry County Sheriff or his designee as the appointed agent to receive and deliver the decedent to the proper authorities in South Carolina. (See Extradition Demand and Agent Authorization signed by Governor John Hickenlooper [PTS000662], attached to brief as Exhibit D.)

**RESPONSE**:  Not disputed.

8.     The Horry County Sheriff then hired PTS, a private company based in Nashville, Tennessee, that is regularly engaged in the interstate transportation of

inmates and detainees, to pick up the decedent at the Boulder County Jail in Boulder, Colorado, and to transport him to the Horry County Sheriff's Office in Conway, South Carolina. (See Transportation Request forms, facsimile cover sheet from Linda Shelley at the Horry County Sheriff's Office to PTS, and PTS worksheet [PTS000657-660 and PTS000673], attached to brief as Exhibit E.)

**RESPONSE**:  Plaintiffs do not dispute that the Horry County Sheriff's Office hired Defendant PTS to transport Dr. Weintraub but add that the contract required that PTS transport Dr. Weintraub safely and ensure that he arrive alive at the final destination. See PTS Prisoner Receipt, attached to Def. Brief as Exhibit F (Delivery Location: Horry County Sheriff's Office); PTS Policy Manual, p. 26–28, attached to Plf. Brief as Exhibit D ("To provide a safe, secure, and humane environment for the transportation of special needs Prisoners PTS shall provide the best possible special care that corresponds to the particular problem or physical/mental impairment of the prisoner"; "In the event that a prisoner develops a medical condition that is life threatening or sustains a life threatening injury this constitutes an emergency and the agent may transport the prisoner to an emergency room immediately. The agent must advise dispatch of the situation and FAX an incident report as soon as possible"; "An inmate must be taken to a Hospital if request is made for medical care").

9.      On April 14, 2014, the decedent boarded a PTS van at the Boulder County

Jail. (See PTS Prisoner Receipt, Prisoner Status Report, Prisoner Property Receipt,

PTS Activities Log, and PTS itinerary for trip no. 0419 [PTS000675-677 and

PTS000680-686], attached to brief as Exhibit F.)

**RESPONSE**:  Dr. Weintraub did not "board" a PTS van at the Boulder

County Jail, but rather was shackled and loaded into a PTS van against his

will. See PTS Policy Manual p. 22, 24, attached to Plf. Brief as Exhibit D ("All

prisoners transported by PTS must be restrained with handcuffs, Martin Chain, leg

irons, and interconnects. In the event it is needed black boxes and an interconnect

chains will be utilized"); ("Loading and Unloading Prisoners . . . the loading and

unloading of prisoners shall be accomplished in such a manner as to provide safety

and security for both agents and prisoners").


10.      The van drove through Wyoming, Utah, Colorado, Kansas, Missouri, and

Illinois before arriving at the Daviess County Detention Center in Owensboro,

Kentucky, on April 18, 2014, for a scheduled layover. (See PTS Activities Log

and PTS itinerary for trip no. 0419 [PTS000680-686], attached to brief as Exhibit

F.)

7

**RESPONSE**:  Not disputed.


11.     The decedent remained at the Daviess County Detention Center for a little more than six days, during which time he complained about severe pain in his stomach as well as other symptoms.

**RESPONSE**:  Not disputed.


12.     At about 8:15 p.m. on April 24, 2014, the decedent boarded another PTS van that was scheduled to take him to Horry County, South Carolina. (See PTS Activities Log and PTS itinerary for trip no. 0434 [PTS000687-696], attached to brief as Exhibit G.)

**RESPONSE**:  Again, Dr. Weintraub did not "board" a PTS van at the Boulder County Jail, but rather was shackled and loaded into a PTS van against his will. In addition, at this time, Dr. Weintraub was unable to lift himself into the van after being shackled and instead had to be pulled or pushed into the van by one or a combination of PTS agents.  See PTS Policy Manual, p. 22, 24, attached to Plf. Brief as Exhibit D ("All prisoners transported by PTS must be restrained with handcuffs, Martin Chain, leg irons, and interconnects. In the event it is needed black boxes and an interconnect chains will be utilized"); ("Loading and

8

Unloading Prisoners . . . the loading and unloading of prisoners shall be accomplished in such a manner as to provide safety and security for both agents and prisoners"); Davis Depo. pp. 33/1–20, excerpts attached to Plaintiffs' Brief as Exhibit C (emphasis added);

> Q.· ·All right.· So you all put him in the van?
> A.· ·Uh-huh.
> **Q.· ·He had to be helped into the van, didn't he?**
> **A.· ·Yeah.**

GBI Investigative Summaries of Inmate Interviews, excerpts attached hereto as Exhibit A (Bates No. WEINTRAUB000001: "the PTS transport guards had to help him into the van . . . they lifted him by his pants"; Bates No. WEINTRAUB000010: "WEINTRAUB could not get into the van on his own"; Bates No. WEINTRAUB000011: "WEINTRAUB was sweating as he was helped onto the van by the transport officials"; Bates No.  WEINTRAUB000018: "Transport officers had to help WEINTRAUB by physically helping him into the van because he could not climb onto the van himself"; Bates No. WEINTRAUB000026: "PTS Officer ARNOLD had to help WEINTRAUB into the transport van. It looked like WEINTRAUB was about to fall back from the van and PTS Officer ARNOLD had to catch him. He observed WEINTRAUB'S pants falling down and his shoe come off"; Bates No. WEINTRAUB000030: "they had to help him physically board the van"; Bates No.  WEINTRAUB000035: "saw

9

WEINTRAUB trying to get on the van but was physically unable to.
WEINTRAUB was picked up by his arms by the transport staff and physically
helped on to the van"); Exhibit 11 to Mary Capps depo., summary of GBI
interview of Judy Waldrep "Two of the PTS Transport Officers lifted
WEINTRAUB by the seat of his pants and arms into the rear of the PTS Transport
van."

13.    The van traveled through Kentucky, Tennessee, and possibly the southwest
corner of North Carolina before arriving at the Union County Jail in Blairsville,
Georgia, for a scheduled stop at about 3:15 a.m. on April 25, 2014. (See PTS
Activities Log [PTS000687], attached to brief as Exhibit G; see also Declaration of
Trevis Arnold, attached to brief as Exhibit H.)

**RESPONSE**:  Plaintiffs do not dispute that the PTS van travelled through
Kentucky and Tennessee, and that it ultimately arrived in Blairsville, Georgia.
Remaining in dispute, however, is the balance of Defendant's "Fact" here:
Defendant's cited evidence does not establish as fact whether the van traveled
through North Carolina whatsoever, as required by NDGa Local Rule 56.1(B)(1).
Additionally, evidence gathered by the GBI investigation into Dr. Weintraub's
death shows that the PTS van did not arrive in Union County until approximately

3:45 p.m.  <u>See</u> GBI Investigative Summary, Bates Nos. WEINTRAUB000039,

WEINTRAUB000041, excerpts attached hereto as Exhibit A.

14.     The decedent was dead by the time the van arrived at the Union County Jail

in Blairsville, Georgia, though the exact time of death is unknown.

**RESPONSE**:  No PTS agent ascertained Dr. Weintraub's condition until at

several minutes after the PTS transport van arrived at the Union County Jail, so it

is possible Dr. Weintraub was still alive when it arrived.  <u>See</u> GBI Investigative

Summary, Bates Nos. Bates Nos. WEINTRAUB000039, WEINTRAUB000041,

excerpts attached hereto as Exhibit A (Bowen and Wheeler interviews both

establishing that Arnold delivered detainee Bremen into Union County's custody

and then escorted two female detainees into the bathroom before then returning to

check on Dr. Weintraub); (Rashawn Johnson interview establishing that the

"officer that was in the training role was first told of the incident but did not come

to the rear of the van or check on Weintraub") (Roger Drennan interview

establishing that inmates tried to alert the PTS agents but were told to "wait for the

boss to come out.")

15.     An autopsy determined that the cause of death was acute peritonitis caused

by a perforated duodenal ulcer. (See GBI autopsy report [WW000051-055], attached to brief as Exhibit I.)

**RESPONSE**:  Not disputed.

16.    Plaintiff has no evidence showing that PTS or its employees caused the decedent's underlying medical problems.

**RESPONSE**:  Plaintiffs object to the phrasing of this "fact" to the extent it is unduly vague, given that "medical problems" is not defined. Dr. Weintraub died of acute peritonitis caused by a perforated duodenal ulcer.  Peritonitis, by definition, is an inflammation of the membrane which lines the inside of the abdomen and all of the internal organs. See Mayo Clinic Definition of Peritonitis, attached hereto as Exhibit B. Unlike a gunshot wound, it is a process that occurs over time, which can become "acute". PTS's agents were presented with objective proof of Dr. Weintraub's worsening condition and denied him medical care, allowing this process to either begin or continue, until it reached a fatal point while Dr. Weintraub was on PTS's transport van. There is thus substantial evidence that PTS by and through its employees caused Dr. Weintraub's ultimate medical condition of "death" as well as the underlying condition of acute peritonitis.

17.     PTS's policy is for its agents to take a prisoner to a medical facility upon request by the prisoner. (PTS's Resp. to Pl.'s Interrog. No. 4, attached to brief as Exhibit J.)

**RESPONSE**:  Plaintiffs do not dispute that PTS has a written policy requiring its agents to take any prisoner to a medical facility upon request by the prisoner.  As discussed in greater detail in Plaintiffs' Statement of Disputed Facts, the dispute herein lies not in whether a written policy exists, but rather whether the PTS agents in whose custody and care Dr. Weintraub was at the time of his death followed those policies.  Additionally, PTS's policies do not require a prisoner to request medical care before medical care must be given to that inmate. See PTS Policy Manual, p. 27, attached to Plf. Brief as Exhibit D ("In the event that a prisoner develops a medical condition that is life threatening or sustains a life threatening injury this constitutes an emergency and the agent may transport the prisoner to an emergency room immediately. The agent must advise dispatch of the situation and FAX an incident report as soon as possible"); PTS Extradition Overview, p. 2, attached to Plf. Brief as Exhibit E ("Prisoners have the Right to receive Medical Treatment").

18.     Dr. Ronald Everson was employed by ACH as the site physician for the

Daviess County Detention Center at all times while the decedent was housed there in April 2014. (Everson Dep. at 15:20-25:3, cited pages attached to brief as Exhibit K.)

    **RESPONSE**:  Not disputed.


19.    PTS and its employees did not have the right or the responsibility to control the method, manner, or details of any medical care provided by the medical staff at the Daviess County Detention Center to the decedent or to any other inmate or detainee. (Everson Dep. at 116:14-116:20, cited pages attached to brief as Exhibit K.)

    **RESPONSE**:  Plaintiffs object to this "fact" due to the fact that it is legal argument rather than a fact, and should therefore not be considered by the Court at this stage. See NDGA Local Rule 56.1(B)(1)(c) ("The court will not consider and fact . . . stated as an issue or legal conclusion"). Whether PTS had the responsibility to control the method, manner, or details of the medical care provided to a detainee it contracted to safely transport cross-country is very much a question meant for the providence of a jury.


20.    PTS and its employees did not actually control the method, manner, or

details of any medical care provided by the medical staff at the Daviess County

Detention Center to the decedent or to any other inmate or detainee. (Everson

Dep. at 116:21-117:2, cited pages attached to brief as Exhibit K.)

**RESPONSE**:  PTS had input in the method, manner, and details of medical

care provided by virtue of its contract with DCDC, that DCDC would provide

medical care to its detainees, it provided the medical paperwork from which

DCDC's medical staff made treatment determinations, and it utilized offloading

and onloading policies that both DCDC and ACH complied with, with regards to a

detainee's medical care. See Interlocal Agreement Between PTS and DCDC,

attached hereto as Exhibit C; Agreement for the Provision of Inmate and/or

Detainee Health Services, attached hereto as Exhibit D; PTS Policy Manual p. 3,

22, 24, 26–28, attached to Plf. Brief as Exhibit D. Plaintiffs do not dispute that PTS

did not engage in real-time consultations concerning day-to-day medical care, and

to that effect are withdrawing their agency claim regarding PTS and ACH.

21.    PTS and its employees did not have any input whatsoever into the method,

manner, or details of any medical care provided by the medical staff at the Daviess

County Detention Center to the decedent or to any other inmate or detainee.

(Everson Dep. at 117:11-117:16, cited pages attached to brief as Exhibit K.)

**RESPONSE**:  PTS had input in the method, manner, and details of medical care provided by virtue of its contract with DCDC, that DCDC would provide medical care to its detainees, it provided the medical paperwork from which DCDC's medical staff made treatment determinations, and it utilized offloading and onloading policies that both DCDC and ACH complied with, with regards to a detainee's medical care. See Interlocal Agreement Between PTS and DCDC, attached hereto as Exhibit C; Agreement for the Provision of Inmate and/or Detainee Health Services, attached hereto as Exhibit D; PTS Policy Manual p. 3, 22, 24, 26–28, attached to Plf. Brief as Exhibit D. Plaintiffs do not dispute that PTS did not engage in real-time consultations concerning day-to-day medical care when they left Weintraub at DCDC, and to that effect are withdrawing their agency claim regarding PTS and ACH. Plaintiffs do maintain, however, that PTS had complete control over the provision of medical access while Dr. Weintraub was in the back of its transport van, as he was at the time of his death.

22.    The medical staff at the Daviess County Detention Center never consulted with PTS or its employees about any medical care provided to the decedent or to any other inmate or detainee. (Everson Dep. at 117:17-117:22, cited pages attached to brief as Exhibit K.)

16

**RESPONSE**:  The medical staff at DCDC used medical paperwork provided by PTS, and it utilized PTS offloading and onloading policies, with regards to a detainee's medical care. See PTS Policy Manual p. 3, 22, 24, 26–28, attached to Plf. Brief as Exhibit D. Plaintiffs do not dispute that PTS did not engage in real-time consultations concerning day-to-day medical care when they left Weintraub at DCDC, and to that effect are withdrawing their agency claim regarding PTS and ACH.

23.     The medical staff at the Daviess County Detention Center always exercised independent medical judgment with respect to medical care provided to the decedent or to any other inmate or detainee. (Everson Dep. at 118:3-118:6, cited pages attached to brief as Exhibit K.)

**RESPONSE**:  PTS consulted with DCDC by virtue of its contract with DCDC that DCDC would provide medical care to its detainees, it provided the medical paperwork from which DCDC's medical staff made treatment determinations, and it utilized offloading and onloading policies that both DCDC and ACH complied with, with regards to a detainee's medical care. See Interlocal Agreement Between PTS and DCDC, attached hereto as Exhibit C; Agreement for the Provision of Inmate and/or Detainee Health Services, attached hereto as

Exhibit D; PTS Policy Manual p. 3, 22, 24, 26–28, attached to Plf. Brief as Exhibit

D. Plaintiffs further object to this "fact" because it is not a fact, but rather an legal

conclusion that should not be considered by the Court pursuant to NDGA Local

Rule 56.1(B)(1)(c) ("The court will not consider and fact . . . stated as an issue or

legal conclusion").


24.     Dr. Everson would not have tolerated any interference by PTS or its

employees with the medical decisions and judgment of the medical staff at the

Daviess County Detention Center. (Everson Dep. at 119:14-119:18, cited pages

attached to brief as Exhibit K.)

**RESPONSE**:  Plaintiffs do not dispute that Dr. Everson stated in his

deposition that he would not have tolerated any interference by PTS with the

medical decisions and judgment of the medical staff at the Daviess County

Detention Center, but this testimony does not establish as fact that Dr. Everson did

not or would not have tolerated any such interference. Dr. Everson was not aware

if any PTS employee "was ever even present at the Daviess County Detention

Center between the time [Dr. Weintraub] was dropped off there on April 18th and

the time he was picked up on April 24th because Dr. Everson was never there

during that time period." See Everson Depo. pp. 119/3–13, excerpts attached to

Def. Brief as Exhibit K. Dr. Everson's deposition statement concerning what he

hypothetically would have done if PTS interfered at DCDC is not a fact, but rather

an issue that should not be considered by the Court pursuant to NDGA Local Rule

56.1(B)(1)(c) ("The court will not consider and fact . . . stated as an issue or legal

conclusion").


25.    Dr. Everson did not believe that he was acting on behalf of PTS when he

treated any inmate or detainee at the Daviess County Detention Center. (Everson

Dep. at 118:17-118:20, cited pages attached to brief as Exhibit K.)

    **RESPONSE**:  Plaintiffs object to this "fact" because it is not a fact, but

rather a subjective belief by the agent of a party opponent, which should not be

considered by the Court pursuant to NDGA Local Rule 56.1(B)(1)(c) ("The court

will not consider and fact . . . stated as an issue or legal conclusion").


26.    Dr. Everson never intended to act on behalf of PTS when he treated any

inmate or detainee at the Daviess County Detention Center. (Everson Dep. at

118:23-119:2, cited pages attached to brief as Exhibit K.)

    **RESPONSE**:  Plaintiffs object to this "fact" because it is not a fact, but

rather a legal conclusion concerning intent, which should not be considered by the

Court pursuant to NDGA Local Rule 56.1(B)(1)(c) ("The court will not consider and fact . . . stated as an issue or legal conclusion"). Further, his intent is irrelevant to the fact that he did in fact treat PTS detainees at DCDC.

Respectfully submitted, this 27th day of May, 2016.

CONLEY GRIGGS PARTIN LLP

/s/ Cale Conley
CALE CONLEY
Georgia Bar No. 181080
RANSE M. PARTIN
Georgia Bar No. 556260
ALYSSA BASKAM
Georgia Bar No. 776157

1380 West Paces Ferry Road, N.W.
Suite 2100
Atlanta, Georgia 30327
Phone: 404-467-1155
Fax: 404-467-1166
cale@conleygriggs.com
ranse@conleygriggs.com
alyssa@conleygriggs.com

PAJCIC & PAJCIC, PA

/s/ Curry Pajcic
CURRY GARY PAJCIC (*pro hac vice*)
Florida Bar No. 0021301
ROBERT LINK (*pro hac vice*)
Florida Bar No. 200743

1 Independent Drive

Suite 1900
Jacksonville, FL 32202
Phone: 904-358-8881
Fax: 904-354-1180
curry@pajcic.com
bob@pajcic.com

ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF PROPER FORMAT</u>

This is to certify that the foregoing was prepared in Times New Roman, 14-point font, in accordance with Local Rules 5.1 and 7.1(D).

This 27th day of May, 2016.

**CONLEY GRIGGS PARTIN LLP**

/s/  *Alyssa Baskam*
ALYSSA BASKAM
Georgia Bar No. 776157

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this date filed and served the foregoing

**PLAINTIFFS' RESPONSE TO DEFENDANT PTS OF AMERICA, LLC'S STATEMENT**

**OF UNDISPUTED MATERIAL FACTS** through the Court's CM/ECF filing system

which will automatically serve a copy of said pleading upon all counsel of record.

This 27th day of May, 2016.

**CONLEY GRIGGS PARTIN LLP**

*/s/  Alyssa Baskam*
ALYSSA BASKAM
Georgia Bar No. 776157